## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **O'BRIEN'S RESPONSE MANAGEMENT, L.L.C. and NATIONAL RESPONSE CORPORATION,** | |
| Plaintiffs/Counterclaim Defendants, **v.** | Civil Action No. 19-01418 |
| **BP EXPLORATION & PRODUCTION INC. and BP AMERICA PRODUCTION COMPANY**, | Section: J |
| Defendants/Counterclaim Plaintiffs/Third Party Plaintiffs, **v.** | Judge Barbier |
| **NAVIGATORS INSURANCE COMPANY**, | Mag. Judge Wilkinson |
| Third Party Defendant. | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

O'Brien's Response Management, L.L.C. ("O'Brien's") and National Response Corporation ("NRC," and together with O'Brien's, the "Responders"), through undersigned counsel, state and allege as follows:

## NATURE OF THE ACTION

1.    Since 2010, BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BP America," and together with BPXP, "BP"), and the Responders have all been defendants in the multidistrict litigation *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-MD-02179-CJB-JCW (E.D. La.) (the "MDL"). At the outset of the case, the Court established the "B3" bundle of claims, which was defined to include, among other things, "**all** claims for personal injury and/or medical monitoring for

exposure or other injury occurring after the explosion and fire of April 20, 2010." Ex. A at 2 (emphasis added).

2.      From the beginning of the litigation, the Responders and BP defended the "B3" claims independently through separate counsel.  As part of that defense, the Responders sought and received indemnity from BP in connection with all of the "B3" claims asserted against them. The Responders also sought, and this Court granted, derivative immunity under the Clean Water Act and discretionary function immunity under the Federal Tort Claims Act.  As a result, the Court ultimately dismissed all of the "B3" claims asserted against O'Brien's and NRC in the MDL with prejudice in its 2016 immunity rulings.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2016 WL 4091416 (E.D. La. Aug. 2, 2016) (the "Follow-Up Immunity Order," annexed hereto as Exhibit B); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2016 WL 614690 (E.D. La. Feb. 16, 2016) (the "Master Immunity Order," annexed hereto as Exhibit C).

3.      BP, in contrast, never tendered any "B3" claim to the Responders for indemnity, in whole or in part, during the first seven years of the MDL proceedings.  Nor did BP ever provide notice that it intended to seek indemnity or contribution from the Responders for any "B3" claim, or advise that it was reserving its rights to do so in the future.  Rather than seeking indemnity—which would have required BP to relinquish its ability to select counsel and control its defense—BP elected to proceed with its counsel of choice and control its own defense.  BP's defense strategy included not pursuing certain available defenses such as immunity and preemption.

4.      BP's strategy instead centered on its unilateral decision to settle the "B3" claims via the Medical Benefits Class Action Settlement Agreement (the "Medical Settlement," annexed

hereto as Exhibit D).   In negotiating the Medical Settlement, BP acted alone and without notifying the Responders of the proposed settlement terms.   At no time during the settlement negotiations did BP (1) seek the Responders' approval of the settlement terms, or (2) assert that it intended to seek indemnity or contribution from the Responders in connection with the "B3" claims.

5.   In the Medical Settlement, BP agreed to the inclusion of a first-of-its-kind back-end litigation option ("BELO") provision, which permitted class members to split their "B3" claims into two parts.   "B3" class members could get immediate payouts around the time of the settlement *and* also continue to pursue their "B3" claim against BP for later-diagnosed injuries and damages stemming from the very same incident or exposure that gave rise to their "B3" claim in the first place.

6.   Plaintiffs are now continuing to pursue their "B3" claims against BP pursuant to the BELO provision that BP unilaterally agreed to as part of the Medical Settlement.   These "B3" claims are being refiled across the country with potentially thousands more waiting in the wings.   In addition, Plaintiffs with "B3" claims who properly chose to opt-out of the Medical Settlement ("Opt-Out") continue to pursue their claims against BP.   As a result, BP is now attempting a blatant about-face on indemnity: recently asserting for the first time that O'Brien's and NRC must indemnify it in full for any "B3" claim (BELO or Opt-Out) pursued by any clean-up worker who worked for O'Brien's or NRC, whether directly or indirectly through sub-contractors, during the *Deepwater Horizon* oil spill response and clean up (the "DWH Response").   BP has advised O'Brien's and NRC that it has similarly requested indemnity from other responder entities that served as contractors to BP during the DWH Response.

7.      BP's multi-year delay in seeking indemnification, including an additional two-year delay with respect to the Opt-Out "B3" claims (which BP failed to seek indemnification for until after the Responders filed the original Complaint in this matter), and its decision to unilaterally enter into the Medical Settlement have severely prejudiced the Responders to the point of extinguishing any indemnity or contribution rights BP may have once had.  As a threshold matter, the BELO "B3" claims continue to exist only because of BP's decision to permit them post-settlement at an indeterminate time, for an indeterminate period, and for an uncapped amount of damages.  BP also unilaterally agreed to waive a number of affirmative defenses and lower a Plaintiff's burden of proof at any later "B3" trial.  For example, BP waived any defense based on claim-splitting, any statute of limitations or repose, the doctrine of laches, the failure to timely pursue a claim, or exclusivity of remedies under workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  BP further agreed to eliminate certain issues or elements that need to be proven by any Plaintiff at any trial pursued pursuant to the Medical Settlement's BELO provision, including (a) the fact of exposure to oil, dispersants, and/or contaminants and (b) the alleged fault of BP in connection with the *Deepwater Horizon* incident, resultant oil spill, and clean-up.  Thus, even if the Responders owed indemnity, BP severely prejudiced the Responders and unilaterally tied their hands in multiple ways that deprived them of significant defenses and arguments that would otherwise be available in the defense of the "B3" claims.  This prejudice operates to discharge any indemnity obligation.

8.      As noted above, BP's indemnity demands are all the more galling because this Court already granted the Responders derivative immunity under the Clean Water Act and discretionary function immunity under the Federal Tort Claims Act, and dismissed all of the

"B3" claims asserted against O'Brien's and NRC in the MDL with prejudice.  BP thus now asks the Responders to indemnify it for conduct that the Responders themselves cannot be liable for.

9.      The refiled "B3" individual BELO actions—against solely BP—are being litigated across the country pursuant to the protocol and limitations that BP unilaterally agreed to in the Medical Settlement, with BP's choice of counsel, at BP's strategic direction, and without the Responders' involvement, notwithstanding their right to control the defense as the purported indemnitor and to limit the extent of risk exposure—a right that applies to the Opt-Out "B3" claims as well.  BP has expressed to O'Brien's and NRC that it wants to maintain this status quo for the thousands of BELO and Opt-Out "B3" claims already filed.  Hundreds, and potentially thousands, of additional Plaintiffs have also recently invoked their BELO rights under the Medical Settlement in order to pursue their personal injury and exposure claims against BP, creating a significant and growing potential liability for the Responders.

10.      This controversy is thus one of sufficient immediacy and significance to justify declaratory relief pursuant to 28 U.S.C. § 2201.  Specifically, an actual controversy of a justiciable nature exists between BP and the Responders concerning the interpretation and ultimate effect of the Medical Settlement, and whether BP is now barred from seeking indemnity or contribution from O'Brien's and NRC with respect to the exposure-based claims expressly contemplated by the Medical Settlement's BELO provision, which can only be asserted against BP, and by the Medical Settlement's Opt-Out provision.

11.      The Responders thus seek declaratory relief from this Court that they owe BP no such indemnity, nor any contribution, in light of BP's own actions and conduct over the past nine years (including its complete failure to even seek indemnity) and the resultant prejudice to the Responders; that any indemnity or contribution rights BP may have once had with respect to

these "B3" personal injury and exposure claims were extinguished once the Medical Settlement was approved by this Court in 2013; and that the immunity already afforded to O'Brien's and NRC by this Court operates to bar any indemnity or contribution claims against them by BP.

12.     BP also recently began claiming that O'Brien's did not properly name BP as an additional insured for "Comprehensive General Liability Insurance . . . with minimum limits of US$2,000,000 per occurrence" as allegedly required under the May 1, 2004 Master Consulting Services Contract, No. BPO-04-01476 (the "O'Brien's Master Agreement"). Dkt. 32 (Amended Counterclaims) ¶¶ 30-31, 113-115. Notably, BP brings this claim *more than 15 years* after that alleged contractual requirement was put in place. BP also claims that the O'Brien's Master Agreement required O'Brien's to name BP as an additional insured not just on the policies required by the contract but also broadly on *"all policies"* that O'Brien's decided to obtain in its discretion. BP claims that this includes the five policies identified in paragraph 85 of its Amended Counterclaims and Third-Party Complaint (Dkt. 32). BP further claims that, if it is not an additional insured on these policies, then O'Brien's "assumes the position of the insurer of all covered losses" and must directly insure BP for "hundreds of millions of dollars of insurance coverage." *Id.* ¶¶ 113-115. O'Brien's, on the other hand, contends that, to the extent the Court determines that BP is not an additional insured, any contractual obligation O'Brien's may have had to name BP as an additional insured on comprehensive general liability coverage is limited on the face of the contract to $2 million, and therefore any obligation O'Brien's may have as a direct insurer of BP is limited to $2 million. An actual controversy of a justiciable nature thus exists between BP and O'Brien's regarding O'Brien's obligations, if any, as a direct insurer of BP.

## THE PARTIES

13.     Plaintiff O'Brien's, formerly known as O'Brien's Response Management, Inc., is a Delaware corporation with its headquarters and principal place of business at 2200 Eller Drive, Fort Lauderdale, FL 33316.

14.     Plaintiff NRC is a Delaware corporation with its headquarters and principal place of business at 3500 Sunrise Highway, Suite 200, Building 200, Great River, NY 11739.

15.     Defendant BPXP is a Delaware corporation with its headquarters at 501 Westlake Park Boulevard, Houston, TX 77079.

16.     Defendant BP America is a Delaware corporation with its headquarters at 501 Westlake Park Boulevard, Houston, TX 77079.

17.     Both BPXP and BP America were signatories and parties to the Medical Settlement.  Pursuant to the BELO provision of the Medical Settlement, *i.e.*, Ex. D at Section VIII(A) thereto, these two entities are the only entities in the BP corporate family that can be named in any renewed "B3" claim.

18.     As part of its amended counterclaims, BP brought a third party complaint against O'Brien's insurers, Navigators Insurance Company ("Navigators"), a New York corporation with its headquarters and principal place of business at 400 Atlantic St., 8th Fl., Stamford, CT 06901.  Dkt. 32 ¶¶ 14, 84-103, 129-143.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction Pursuant to the Express Terms of the Medical Settlement and the Court's Order Approving the Medical Settlement

19.     Subject matter jurisdiction is proper in this Court pursuant to the express terms of the Medical Settlement.  In the Medical Settlement, BP agreed that this Court "shall retain continuing and exclusive jurisdiction" for adjudicating claims asserted against BP "with respect

7

to the terms of" the Medical Settlement as well as "the interpretation, implementation, administration, and enforcement" thereof.  Ex. D at Section XXVII.

20.     Subject matter jurisdiction is also proper in this Court pursuant to this Court's January 11, 2013 Order and Judgment Granting Final Approval of [the Medical Settlement] and Confirming Certification of the Medical Benefits Settlement Class (the "Final Approval Order") (Rec. Doc. 8218) (annexed hereto as Exhibit E).  In the Final Approval Order, this Court "expressly adopt[ed] and incorporate[d] the terms of" the Medical Settlement "as if fully set forth [t]herein such that . . . a dispute concerning the interpretation, implementation, administration, or enforcement of the terms of the [Medical  Settlement] will implicate this Final Approval Order and fall within this Court's ancillary jurisdiction to enforce its own orders."  Ex. E ¶ 21.

21.     In the Final Approval Order, this Court also retained "continuing and exclusive jurisdiction" over the parties to the Medical Settlement—necessarily including BP—and the Medical Settlement itself in order "to interpret, implement, administer and enforce [it] in accordance with its terms."  Ex. E ¶ 22.  The Court made clear in the Final Approval Order that it was seeking to satisfy the requirements of *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), that is, "to speak clearly when it wishes to retain jurisdiction."  Ex. E ¶ 10.

### *OCSLA Jurisdiction*

22.     Subject matter jurisdiction is also vested in this Court under the broad jurisdictional grant of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.* ("OCSLA").  OCSLA provides, in relevant part, that the "district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with [] any operation conducted on the outer Continental Shelf which involves exploration, development, or

production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." *Id.* § 1349(b)(1). OCSLA further defines "minerals" to include "oil, gas, sulphur, geopressured-geothermal and associated resources." *Id.* § 1331(q). "Exploration" is the "process of searching for minerals, including . . . any drilling." *Id.* § 1331(k).

23. On April 20, 2010, the *Deepwater Horizon* rig was engaged in oil exploration activities in Mississippi Canyon Block 252—the location known as "Macondo"—on the Outer Continental Shelf (the "OCS") off the coast of Louisiana. Following a loss of well control and one or more fires and explosions, the rig sank, and the oil spill and DWH Response began. The U.S. Court of Appeals for the Fifth Circuit and this Court, among others in this Circuit, have repeatedly acknowledged that the *Deepwater Horizon* rig was operating and drilling at the Macondo well on the OCS and that this work was done as part of BP's exploration efforts in the Gulf of Mexico. OCSLA jurisdiction is thus appropriate with respect to a variety of claims relating to the *Deepwater Horizon's* operations at the Macondo well, and ultimately the DWH Response, as the sole reason for undertaking the clean-up effort was to minimize the impact of the discharge from the uncontrolled well on the OCS. This dispute as to whether BP can seek indemnity or contribution from any of the Responders for Plaintiffs' claims relating to purported exposure during the DWH Response thus arises out of, and has a connection with, an operation that was conducted on the OCS within the meaning of OCSLA.

24. BP has repeatedly taken the position that subject matter jurisdiction is vested in this Court under OCSLA for "B3" claims, removing a number of them from state court to federal court on that basis. This dispute likewise relates to the "B3" claims and necessarily is subject to the same jurisdictional analysis.

*Federal Question Jurisdiction*

25.     In addition, this Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because the claims asserted arise in connection with a federal statute, namely, OCSLA, as discussed above, and because claims involving federal enclaves like the OCS by their nature arise under federal law.  OCSLA not only provides that federal courts have original jurisdiction over all cases arising out of operations on the OCS, it also directly specifies that federal law governs as a substantive matter.  *See* 43 U.S.C. § 1333(a)(1).

26.     O'Brien's and NRC agreed, in their respective service contracts with BP and their appropriate amendments, to provide oil spill response and clean-up services in the DWH Response.  These services were necessarily contemplated to be performed on or relating to the OCS, as the drilling and subsequent loss of well control at the Macondo well occurred on the OCS and the oil was discharging out of a well on the OCS.

27.     Further, this Court also has subject matter jurisdiction under 28 U.S.C. § 1333 because the claims asserted by the Responders arise under and/or relate to the Medical Settlement, which is expressly governed by maritime law.  *See* Ex. D at Section XXX.P ("[T]his MEDICAL SETTLEMENT AGREEMENT and the RELEASE hereunder shall be interpreted in accordance with General Maritime Law.").  Federal courts have original jurisdiction over any civil case involving maritime law.  S*ee* 28 U.S.C. § 1333(1).  Indeed, BP has repeatedly admitted in Answers to BELO complaints that these claims are governed by maritime law.  *E.g.*, Answer, *Colston v. BP Expl. & Prod. Inc.*, No. 2:18-CV-9563-CJB-JCW (E.D. La. Nov. 14, 2018) (Rec. Doc. 4 at 2).  BP has also been asserting an affirmative defense in its BELO answers that "[m]aritime law preempts all state law claims that are or may be asserted in this action."  *Id.* at 7.

*Personal Jurisdiction and Venue*

28.     BP expressly submitted to personal jurisdiction in this Court for all controversies arising out of or related to "B3" claims and the Medical Settlement.  As a party to the Medical Settlement, BP also expressly consented to venue in this Court.  Specifically, BP agreed in the Medical Settlement to "submit[] to the exclusive jurisdiction of this COURT for any suit, action, proceeding, or dispute arising out of or relating to" the Medical Settlement, and that this Court would be the "continuing and exclusive" forum for adjudicating such claims.  Ex. D at Section XXVII.

29.     This Court also has personal jurisdiction over BP, and venue is proper, because a substantial part of the events or omissions giving rise to the personal injury and oil and/or dispersant exposure claims at the heart of this action occurred in Louisiana.

30.     The Incident Command System ("ICS") was the organizational structure used by the United States Department of Homeland Security to execute the DWH Response, and its Unified Area Command ("UAC") headquarters were located in Robert, Louisiana, and then moved to New Orleans, Louisiana.  One of the Incident Command Posts ("ICPs") established by the United States Coast Guard during the DWH Response was also set up in Houma, Louisiana ("ICP Houma").  ICP Houma served as one of the operational units of the various response operations, and aerial dispersant operations were managed exclusively out of that post.  BP, as the responsible party, was fully integrated into this ICS structure and filled various positions within it and at the ICPs, including ICP Houma.

31.     During the DWH Response, the Responders' employees or representatives filled various positions within the ICS, including at the UAC headquarters and at the ICPs, including ICP Houma.  In all of these positions, the Responders' employees acted under the leadership and

11

at the direction of the Federal On-Scene Coordinator ("FOSC") (the federal official designated to direct the DWH Response), the FOSC's representatives, and/or other federal officials.  In so doing and engaging in clean-up work in Louisiana, O'Brien's and NRC complied with all federal government directives and orders applicable to them throughout the DWH Response and did not exceed those directions and orders.

32.     In addition, as a classified oil spill removal organization pursuant to the United States Coast Guard's Oil Spill Removal Organization program, NRC was also called upon to mobilize its equipment and trained personnel to assist with various aspects of the DWH Response efforts.  NRC equipment and personnel were involved with the skimming, booming, onshore clean-up, vessel decontamination, and dispersant operations conducted out of certain of the ICPs, including ICP Houma, all as authorized and directed by the federal government.

### Statement Pursuant to Local Civil Rules 3.1 and 3.1.1

33.     Local Civil Rules 3.1 and 3.1.1 require the consolidation of a later-filed case with an earlier-filed case if the two cases involve "a material part" of the same "subject matter" or "operative facts."  Per Local Rule 3.1.1, the purpose of this collateral proceeding rule is to "promote judicial economy, conserve judicial resources, and avoid potential forum shopping and conflicting court rulings."

34.     Pursuant to the guidance and spirit of these rules, the Responders hereby provide notice that this case is a collateral proceeding to the MDL and contend that consolidation is appropriate.  This case relates to the "B3" claims asserted in the MDL with respect to the DWH Response and BP's Medical Settlement purporting to settle the majority of the "B3" personal injury and exposure claims that had been asserted against it.  The Court overseeing the MDL is

well familiar with this subject matter and these facts, and retained exclusive jurisdiction over controversies arising out of or relating to the Medical Settlement for precisely that reason.

## FACTUAL BACKGROUND

### *Formation of the MDL and the "B3" Pleading Bundle*

35.   On May 7, 2010—just a few weeks after the DWH Response began—BPXP moved before the Judicial Panel on Multidistrict Litigation (the "JPML") seeking consolidation and transfer of 70 cases that had already been filed against it relating to the incident aboard the *Deepwater Horizon* and resultant oil spill.  BPXP's motion (the "MDL Formation Motion") is annexed hereto as Exhibit F.

36.   In its MDL Formation Motion, BP argued that a broad, large multidistrict litigation was appropriate and that the issues "can and should be determined by one judge, in one proceeding" to avoid inconsistent rulings, conserve both judicial and party resources, and eliminate or at least reduce inefficiencies and duplicative discovery.  Ex. F at 6-9.

37.   On August 10, 2010, the JPML issued an order forming the MDL and transferring a variety of pending cases in federal courts across the country to this Court (the "Transfer Order," annexed hereto as Exhibit G).  In the Transfer Order, the JPML noted, among other things, that "it makes sense to include the personal injury/wrongful death actions" in the MDL as they "do overlap factually with the other actions."  Ex. G at 3.

38.   On October 19, 2010, the Court issued Pretrial No. 11 (Case Management Order No. 1) in the MDL ("PTO 11," annexed hereto as Exhibit H).  Via PTO 11, the Court established eight separate "pleading bundles" for different categories of cases and claims to facilitate the effective administration of the MDL, including the "B3" bundle.

39.     The "B3" bundle was originally designated as the bundle for "Post-Explosion Clean-up Claims" and was described to "include all claims related to post-explosion clean-up efforts and will be pled separately and uniformly in a Master Complaint, and such claims shall not be included in any other Pleading Bundles or Master Complaints." Ex. H at 3.

40.     The Master Complaint with respect to the "B3" claims (the "B3 Master Complaint") was filed by the Plaintiffs' Steering Committee (the "PSC") consistent with PTO 11 on December 15, 2010 and named BPXP, BP America, O'Brien's, and NRC as defendants, among others.  (Rec. Doc. 881).  The PSC amended the B3 Master Complaint on March 30, 2011, again naming BPXP, BP America, O'Brien's, and NRC as defendants.  (Rec. Doc. 1812). Generally, the B3 Master Complaint alleges that Plaintiffs were exposed to oil, dispersants, and other chemicals while performing clean-up activities during the DWH Response or by virtue of residing nearby coastal waters, and that Defendants' conduct or actions caused all injuries stemming from such exposure.

41.     On January 12, 2011, the Court issued Pretrial Order No. 25 in the MDL ("PTO 25," annexed hereto as Exhibit A).  PTO 25 clarified the "B3" bundle designation set forth in PTO 11, noting that "B3" bundle would be designated for "Clean-Up, Medical Monitoring, and Post-April 20 Personal Injury Claims."  Ex. A at 2.  PTO 25 also clarified the breadth of the "B3" classification, noting that it "will include **all** claims, **of any type**, relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  Ex. A at 2 (emphasis added).

42.     The "B3" classification of claims set forth in PTO 11, as amended by PTO 25, was never subsequently modified.  The definition set forth in PTO 25 remains the operative definition of what constitutes a "B3" claim.

*O'Brien's and NRC's Timely Requests for Indemnity from BP*

43.     On July 20, 2010, O'Brien's was named in its first personal injury action relating to the DWH Response in Louisiana state court (the "*Wunstell* Action").  The *Wunstell* Action, which had been removed to federal court, was consolidated with the MDL pursuant to the Transfer Order.

44.     On August 6, 2010, O'Brien's promptly tendered the *Wunstell* Action to BP in writing, seeking defense and indemnity pursuant to Articles 11.03, 11.04, and 11.08 of the O'Brien's Master Agreement between BP and O'Brien's, as amended by a June 1, 2010 Bridge Agreement, No. HOU-WL4-3066 (the "O'Brien's Bridge Agreement").

45.     On January 21, 2011, NRC promptly tendered the claims asserted in the B3 Master Complaint to BP in writing, seeking defense and indemnity pursuant to Article 9.2 of the July 1, 2003 Agreement for the Provision of Response Resources, No. BPM-03-00864 (the "NRC Master Agreement") between BPXP and NRC, as well as the O'Brien's Bridge Agreement.

46.     By May 9, 2011, BP agreed to indemnify O'Brien's and NRC with respect to all "B3" claims asserted against them in the MDL.

47.     On May 20, 2011, the Responders and BP came to a cost-sharing arrangement with respect to the fees and expenses associated with defending against the "B3" claims asserted against O'Brien's and NRC.  This agreement permitted O'Brien's and NRC to use their selected litigation counsel to represent them in the MDL, who had already been appointed Defense

Liaison Counsel by the Court.  The parties also agreed to collaborate and cooperate with one another in defending against the "B3" claims.

48.     The Responders and BP have operated pursuant to the terms of their agreements discussed in the preceding two paragraphs since May 20, 2011.  BP has consistently reimbursed the Responders for legal fees and expenses incurred in defending against the "B3" claims asserted against them in the MDL.  And O'Brien's and NRC have consistently collaborated and cooperated with BP with respect to the defense of the "B3" claims in the MDL.

### For Seven Years, BP Never Demands Indemnity

49.     In contrast to the Responders' prompt indemnity demands as to the "B3" claims, BP never sent a similar tender letter to either O'Brien's or NRC.  Nor did BP reserve its rights to seek indemnity for (a) any individual "B3" claim that fell within the O'Brien's "Contractor Group," as defined in Article 11.01.03 of the O'Brien's Bridge Agreement, or (2) any individual "B3" claim "caused by the gross negligence or willful misconduct" of NRC pursuant to Article 9.1 of the NRC Master Agreement.  Indeed, despite multiple opportunities, BP failed again and again to request indemnity or even put the Responders on notice of a potential indemnity claim.

50.     BP did not tender indemnity demands in response to claims asserted against it in the Transocean Limitation Action in the MDL.  On February 18, 2011, Transocean filed a Third Party Complaint pursuant to Rule 14(c) of the Federal Rules of Civil Procedure against, among others, BPXP, BP America, O'Brien's, and NRC (the "Transocean Third Party Complaint," and with the "Transocean Limitation Action," the "Transocean Litigation").  A number of cross-claims and counter-claims were asserted in the Transocean Litigation, including for indemnity and contribution.  BP asserted cross-claims against Transocean, Cameron International Corporation, and Halliburton Energy Services, Inc.

16

51.     Despite being given the opportunity to do so, BP did not file any claims against O'Brien's and NRC in the Transocean Litigation, and necessarily asserted no cross-claims for indemnity or contribution against O'Brien's and NRC with respect to the "B3" claims asserted in the MDL.  Given BP's decision not to assert any cross-claims for indemnity or contribution against O'Brien's and NRC in the Transocean Litigation, O'Brien's and NRC had no reason to believe that BP had any intention to seek indemnity or contribution from them with respect to any of the "B3" claims, whether in whole or in part.  Rather, O'Brien's and NRC understood BP to be pursuing indemnity and/or contribution from other parties and/or contractors named as defendants in the MDL.

52.     Likewise, when BP answered the B3 Master Complaint, it asserted indemnity and contribution affirmative defenses but did not reference any of the Responders as being a party owing them indemnity or contribution for the "B3" claims.  *See* BP's Answer, filed on November 16, 2012 (the "Answer," annexed hereto as Exhibit I).

53.     At the time it filed the Answer, BP did not advise O'Brien's or NRC that it was or would be asserting indemnity or contribution claims as against them with respect to any of the "B3" claims, whether in whole or in part.  Given BP's decision not to assert an indemnity or contribution claim against O'Brien's and NRC in connection with or after it filed the Answer, O'Brien's and NRC had no reason to believe that BP had any intention to seek indemnity or contribution from them with respect to any of the "B3" claims, whether in whole or in part.

### O'Brien's and NRC Seek, and Are Ultimately Granted Immunity for, the "B3" Claims

54.     After the B3 Master Complaint was filed in the MDL, O'Brien's and NRC focused on their immunity and preemption arguments in defending against the "B3" claims.

55.     As early as in their February 28, 2011 Motion to Dismiss, O'Brien's and NRC argued that (1) they were entitled to derivative immunity under the Clean Water Act (the

"CWA"), as well as discretionary function immunity under the Federal Tort Claims Act (the "FTCA"), and (2) the implied conflict preemption doctrine applied to the "B3" claims asserted against them.  (Rec. Doc. 1388).

56.     On September 30, 2011, the Court issued its Order and Reasons with respect to the various motions to dismiss that had been filed with respect to the B3 Master Complaint, as amended (the "MTD Order").   (Rec. Doc. 4159).   The MTD Order was later amended and reissued on October 4, 2011.  (Rec. Doc. 4209).

57.     In its MTD Order, the Court recognized the availability of derivative immunity and preemption in the context of a Spill of National Significance, but held that "[d]erivative immunity and preemption are not established on the face of the Complaint."  *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2011 WL 4575696, at *12 (E.D. La. Oct. 4, 2011).  Indeed, the Court stated that "it seems at this point that if the facts revealed that the Clean-Up Defendants were using dispersants as directed by the federal government, then they would be entitled to derivative governmental immunity."  *Id.* at *7.  The Court thus held that "[t]hese arguments are preserved and may be re-asserted."  *Id.* at *12.

58.     Following the issuance of the MTD Order, a "Schedule for Limited B3 Discovery" was designed to develop "the facts necessary" for O'Brien's and NRC, among other similarly-situated defendants, to "file motions renewing their preemption [and] derivative immunity arguments."  (Rec. Docs. 4472, 5000).   Limited "B3" discovery then proceeded pursuant to this Schedule.

59.     On February 16, 2012, the PSC sought to amend the B3 Master Complaint to dismiss the claims against O'Brien's and NRC (and other similarly-situated defendants) without prejudice.   (Rec. Doc. 5718).   BP (among others) opposed this motion, arguing that "[t]he

purpose of the B3 bundle is to create an efficient case management system to decide common issues for the individual claimants," and that preserving any portion of a "B3" claim to then reassert it later would violate PTO 11 and PTO 25, and in turn, "defeat[] the purpose of the B3 pleading bundle."  (Rec. Doc. 5846 at 2) ("BP's Opposition to the Motion to Amend").

60.     BP's Opposition to the Motion to Amend was premised on the argument that the purpose of forming the "B3" bundle in the MDL was to construct a broad grouping of clean-up and exposure-based claims that would be decided and/or tried together, where applicable.  In BP's Opposition to the Motion to Amend, BP effectively conceded that it would be inefficient for an individual claimant to carve up his or her "B3" claim into component parts.

61.     The Court denied the PSC's request to amend the B3 Master Complaint on April 16, 2012.  (Rec. Doc. 6247).  O'Brien's and NRC thus remained named "B3" defendants in the B3 Master Complaint.

62.     O'Brien's and NRC renewed their CWA and FTCA derivative immunity and implied preemption arguments via a Motion for Summary Judgment filed on May 18, 2012 (the "Immunity MSJ").  (Rec. Doc. 6536).  BP was well aware of the Immunity MSJ before it was filed.  In fact, O'Brien's and NRC collaborated with BP with respect to the arguments made therein before filing.  Following full briefing and oral argument with respect to the Immunity MSJ, the Court took the Immunity MSJ under advisement.

63.     Prior to the filing of the Immunity MSJ, BP never advised O'Brien's and NRC that it would be seeking indemnity or contribution for any individual "B3" claim asserted against it, whether in whole or in part.  During the pendency of the Immunity MSJ, BP did not advise O'Brien's and NRC that it would be seeking indemnity or contribution for any individual "B3" claim asserted against it, whether in whole or in part.

64.     On February 16, 2016, the Court granted O'Brien's and NRC's Immunity MSJ for all but eleven plaintiffs.  *See generally* Ex. C (Master Immunity Order).  On May 9, 2016, O'Brien's and NRC renewed their derivative immunity and preemption arguments as to the remaining eleven Plaintiffs, and this motion was granted on August 2, 2016.  *See generally* Ex. B (Follow-Up Immunity Order).

65.     In the Master Immunity Order and Follow-Up Immunity Order (together, the "Immunity Orders"), the Court explained that all of the undisputed evidence in the record showed that both O'Brien's and NRC acted pursuant to the authorization, direction, and ultimate control of the federal government during the DWH Response and found that O'Brien's and NRC were entitled to derivative immunity under the CWA and the FTCA with respect to all of the "B3" claims that had been asserted against them in the MDL.  In its Immunity Orders, the Court also found that the implied conflict preemption doctrine applied to all of the "B3" claims asserted against O'Brien's and NRC in the MDL.

66.     By virtue of the Immunity Orders, all of the "B3" claims asserted against O'Brien's and NRC in the MDL have been dismissed with prejudice.

***The Adjournment of the Phase One Trial and BP's Settlement Announcements***

67.     "Phase One" of the trial in the MDL—*i.e.*, the "Incident Phase" to address "fault determinations relating to the loss of well control, the ensuing explosion and fire, the sinking of the DEEPWATER HORIZON, and the initiation of the release of oil from the well"—was scheduled to commence on February 27, 2012.  (Rec. Docs. 5732 at 1, 13381-1 at 8).  On the eve of trial, the Court adjourned the commencement of the trial until March 5, 2012 in order "to allow the parties to make further progress in their settlement discussions."  (Rec. Doc. 5887).

68.     The Phase One trial was further adjourned on March 2, 2012 when the PSC and counsel for BP advised the Court that they had reached an agreement on the terms of a proposed class action settlement.

69.     On April 17, 2012, BP announced that it had actually "reached definitive and fully documented agreements" with the Plaintiffs in the MDL with respect to both (a) the economic and property damages claims asserted against BP in the MDL (*i.e.*, with respect to the "B1" bundle of claims, as defined in PTO 11), and (b) the personal injury and exposure claims that had been asserted against BP in the MDL (*i.e.*, with respect to the "B3" bundle of claims, as defined in PTO 11 and clarified in PTO 25).  Both of those class action settlement agreements were filed in the MDL on April 18, 2012 and the parties thereto sought Court approval.  (Rec. Docs. 6266, 6267).

70.     The Medical Settlement served as BP's settlement of the "B3" claims asserted against it in the MDL.  The only signatories to the Medical Settlement were BPXP, BP America, and Plaintiffs (via class counsel).  None of the Responders were parties or signatories to the Medical Settlement.

71.     At no point were the Responders or any of their respective affiliates involved in BP's settlement negotiations with the Plaintiffs in the MDL.  BP never sought the Responders' input with respect to, or approval in agreeing to, any term or condition in the Medical Settlement.

72.     The first time the Responders became aware of any of the terms and conditions of the Medical Settlement is when they were posted on the MDL docket.  None of the Responders were aware that BP had agreed to a BELO provision in the Medical Settlement before that settlement was made public.

*The Medical Settlement*

73.     The Medical Settlement was amended on May 1, 2012.  This version remains the final version thereof.

74.     The Medical Settlement provides for certain compensation to class members who (a) have or have had in the past at least one SPECIFIED PHYSICAL CONDITION (as that term is defined in the Medical Settlement) and (b) according to the Claims Administrator's review, have satisfied the proof requirements and other criteria set forth in the Medical Settlement, such as the submission of a proof of claim form.  Exhibit 8 to the Medical Settlement is a detailed matrix that sets forth how much compensation a class member will receive for each type of condition or injury and what proofs are required in order to obtain compensation.

75.     In its BELO provision, the Medical Settlement also permits every single class member to pursue litigation against BP for a LATER-MANIFESTED PHYSICAL CONDITION (as that term is defined in the Medical Settlement) provided that each class member seeking to invoke his or her BELO rights provides BP advance warning via a Notice of Intent to Sue ("NOIS"), after which time BP may elect to mediate the claim at its discretion.  Ex. D at Section VIII.A.

76.     The term LATER-MANIFESTED PHYSICAL CONDITION is broadly defined at Section II.VV of the Medical Settlement as an exposure-based physical condition that is first diagnosed after April 16, 2012, *i.e.*, after BP and the PSC announced that they had reached an agreement to settle the "B3" claims asserted against BP via the Medical Settlement.

77.     To qualify as a LATER-MANIFESTED PHYSICAL CONDITION, a class member's exposure-based injury need not have actually manifested itself after the Medical Settlement was announced or was made effective.   As such, exposure-based injuries or

conditions that had already manifested themselves but had not yet been diagnosed could qualify as a LATER-MANIFESTED PHYSICAL CONDITION for which any class member could pursue litigation pursuant to the Medical Settlement's BELO provision.

78.     Pursuant to Section VIII.A of the Medical Settlement, any class member may pursue litigation against BP pursuant to the BELO provision "within 4 years after either the first diagnosis of that LATER-MANIFESTED PHYSICAL CONDITION or the EFFECTIVE DATE, whichever is later."

79.     The Medical Settlement does not set forth a temporal window within which a LATER-MANIFESTED PHYSICAL CONDITION must be diagnosed after it has manifested itself in order for a class member to be able to invoke his or her BELO rights and assert an exposure-based claim against BP.

80.     The Medical Settlement does not set forth a global temporal cutoff by which a LATER-MANIFESTED PHYSICAL CONDITION must be diagnosed in order for a class member to be able to invoke his or her BELO rights and assert an exposure-based claim against BP.

81.     The Medical Settlement thus permits every single class member to indefinitely invoke his or her BELO rights, provided he or she does so within four years of diagnosis of the injury or condition for which he or she pursues BP for compensation.

82.     The Medical Settlement does not set forth a cap on the compensation any individual class member can seek or be awarded in any litigation filed pursuant to the Medical Settlement's BELO provision.

83.     The Medical Settlement does not set forth an overall cap on the compensatory damages that BP can be held liable for in litigation filed by class members pursuant to the Medical Settlement's BELO provision.

84.     In the Medical Settlement, BP agreed to permit each and every class member to split their exposure-based claim into two component parts—that is, BP permitted each class member to receive a payout under the Medical Settlement around that time and then pursue litigation for a LATER-MANIFESTED PHYSICAL CONDITION at a later juncture.

85.     In the Medical Settlement, BP agreed to permit each and every class member to reinvigorate his or her "B3" exposure claim if he or she was diagnosed with a new exposure-based condition after April 16, 2012.

86.     In Section VIII.G(2)(d) of the Medical Settlement, BP agreed to waive any defense based on claim splitting, any statute of limitations or repose, the doctrine of laches, the failure to timely pursue a claim, or exclusivity of remedies under workers' compensation law or the Longshore and Harbor Workers' Compensation Act with respect to every single individual action pursued pursuant to the Medical Settlement's BELO provision.

87.     In Section VIII.G(3)(b) of the Medical Settlement, BP agreed to eliminate certain issues or elements that need to be proven by any Plaintiff at any trial pursued pursuant to the Medical Settlement's BELO provision, including (a) the fact of exposure to oil, dispersants, and/or contaminants and (b) the alleged fault of BP in connection with the *Deepwater Horizon* incident, resultant oil spill, and clean-up.

88.     In its Opt-Out provision, the Medical Settlement permits class members to opt-out of the Medical Settlement by submitting a written request with identifying information to the Claims Administrator by a Court-ordered date.  Ex. D at Section XI.E.

24

89.     Nothing in the Medical Settlement states that BP may seek indemnity or contribution from O'Brien's or NRC for any benefit provided to Medical Settlement class members.   Nothing in the Medical Settlement states that BP may seek contractual indemnity from O'Brien's or NRC in connection with any litigation pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions.   Nothing in the Medical Settlement states that BP may seek common law indemnity or contribution from O'Brien's or NRC in connection with any litigation pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions.   Nothing in the Medical Settlement advised that BP intended to tender the BELO portion of any individual "B3" claim or tender any Opt-Out "B3" claims to O'Brien's or NRC in the future.   Nothing in the Medical Settlement purports to strip O'Brien's or NRC of any rights.

90.     Nothing in the Medical Settlement could have put any of the Responders on notice of the fact that any of their rights were interfered with or were otherwise limited.   The only reference to any of the Responders in the Medical Settlement is in the release.

91.     The Responders were not afforded the opportunity to provide input on the terms of or strategy with respect to the Medical Settlement, including its BELO provision.   The Responders were not afforded the opportunity to make the decision about whether they should agree to an effective stay of exposure-based litigation against BP, with no reasonable estimate of or "cap" to the overall potential future financial exposure and no concrete parameters surrounding the timing or scope of the resurgence.   The Responders were not afforded the opportunity to make the decision as to whether waiving any defense on the part of BP was strategically beneficial or appropriate.   The Responders were not provided with the opportunity to make the decision as to whether limiting a class member/Plaintiff's burden of proof at any trial against BP was strategically beneficial or appropriate.

92.     The Responders did not consent to splitting a "B3" claim into two component parts.  The Responders did not consent to permitting a second round of "B3" litigation against BP, as contemplated by the Medical Settlement's BELO provision.  The Responders did not consent to the waiver of a variety of defenses in any litigation pursued pursuant to the Medical Settlement's BELO provision, any one of which could be the basis for dismissal with prejudice.  The Responders did not consent to limiting the issues, elements, and proofs that need be proven by a Plaintiff at any trial relating to a LATER-MANIFESTED PHYSICAL CONDITION, as contemplated by the Medical Settlement's BELO provision.

93.     Once the Medical Settlement was made public and posted on the MDL docket, BP did not advise O'Brien's and NRC that it would be seeking indemnity or contribution for any individual "B3" claim (BELO or Opt-Out), whether in whole or in part.  Nor did BP advise O'Brien's and NRC that it was reserving its rights to seek indemnity or contribution with respect to any litigation pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions.

### *Seeking Court Approval of the Medical Settlement*

94.     On April 18, 2012, Plaintiffs and BP filed a joint brief seeking preliminary approval of the Medical Settlement (Rec. Doc. 6267), and the Court held a preliminary approval hearing on April 25, 2012 (the "Approval Hearing").

95.     At the Approval Hearing, the parties discussed the BELO provision at length, with the PSC noting that the "B3" Plaintiffs "have not given up their right to sue BP for [] later-manifested illness" and counsel for BP conceding that "[i]t's an unusual settlement" in that "[a]ll class members . . . are eligible" for compensation payouts now and can invoke their BELO rights later as against BP.  Apr. 25, 2012 Hr'g Tr. (annexed hereto as Exhibit J) at 74:9-10, 89:21, 90:5-7.  The parties also discussed Plaintiffs who chose to exercise their right to Opt-Out of the

Medical Settlement, and that BP would manage that process.  Ex. J at 12:14-18, 13:22-14:2, 14:23-15:3, 92:2-9.

96.     At no point during the Approval Hearing did BP indicate that it would be seeking, or was reserving its rights to seek, indemnity or contribution from O'Brien's or NRC with respect to any class member's invocation of his or her BELO or Opt-Out rights in the future.

97.     The Court issued an order preliminarily approving the Medical Settlement on May 2, 2012.  (Rec. Doc. 6419).

98.     Both BP and the Plaintiffs subsequently submitted briefing supporting their motions for final approval of the Medical Settlement.  BP's briefing noted that it had made the decision to "forego defenses" with respect to any claimant's invocation of his or her BELO rights, and had also stipulated that certain issues "need not be proven and may not be litigated at [any] trial."  Aug. 13, 2012 Memorandum in Support of BP's Motion for Final Approval of the Medical Settlement (Rec. Doc. 7112-1) (the "BP Approval Briefing," annexed hereto as Exhibit K) at 37.  In the BP Approval Briefing, BP also described the BELO provision as "involv[ing the] compromise by and consideration exchanged by both BP and the Class Members."  Ex. K at 63.  The BP Approval Briefing also discussed Plaintiffs who chose to exercise their right to Opt-Out of the Medical Settlement.  Ex. K at 42, 58, 66, 67 n.44, 72 n.53.  Nowhere in the BP Approval Briefing did BP even purport to suggest that any of the Responders were involved in making decisions or compromises with BP or that BP would seek indemnity from them.

99.     In discussing why the Medical Settlement should be approved as fair, reasonable, and adequate, BP noted the pendency of the Immunity MSJ and suggested that it, too, could argue that it should be granted derivative immunity, at least with respect to "the training and protection of workers and the use of dispersants" as those decisions "were all done with the input

and approval of the government." Ex. K at 54. BP chose not to make this derivative immunity argument, which is the same one the Responders successfully made as to their own liability.

### *The Fairness Hearing*

100.    The Court held a final fairness hearing with respect to the Medical Settlement on November 8, 2012 (the "Fairness Hearing").

101.    At the Fairness Hearing, the PSC explained that "all class members can sue BP on what's call[ed] a B[E]LO, a back-end litigation option, if they were to unfortunately experience a later manifested physical condition. No one gives up the right down the road to seek compensation for that." Nov. 8, 2012 Hr'g Tr. (annexed hereto as Exhibit L) at 190:22-191:1.

102.    At the Fairness Hearing, the PSC described the BELO provision as having "no preset limit or cap on the recovery" and permitting Plaintiffs "to make choices later on to pursue claims under relaxed standards of causation, and with defenses such as statutes of limitation and liability waived." Ex. L at 206:9-12, 206:23.

103.    At the Fairness Hearing, upon questioning from the Court regarding what a Plaintiff would need to prove at any BELO trial, the PSC conceded that "their case becomes less expensive to try" because, among other things, they need not hire experts or "muster that evidence" to prove the liability of BP. Ex. L at 206:25-207:13.

104.    At the Fairness Hearing, the Court commented on the "trade-off" made by both sides with respect to the BELO provision in the Medical Settlement, as well as the fact that the Medical Settlement was not generally "capped" by BP. Ex. L at 255:7-10, 275:7-9.

105.    At the Fairness Hearing, the Court also discussed Plaintiffs who chose to exercise their right to Opt-Out of the Medical Settlement, including a one-month extension of the deadline to do so. Ex. L at 12:11-14, 13:3-9, 14:23-15:4, 18:7-13, 234:18-23. The PSC

discussed estimates of the number of Opt-Out "B3" Plaintiffs at that time and the types of "B3" Plaintiffs who should exercise their Opt-Out rights.  Ex. L at 194:15-25, 259:13-19.  BP further discussed that it would file a declaration identifying all of the Opt-Out "B3" Plaintiffs, the types of "B3" Plaintiffs who should exercise their Opt-Out rights, and that Opt-Out "B3" cases "will be tried at some distant point in the future."  Ex. L at 210:13-19, 264:23-265:4.

106.    At no point during the Fairness Hearing did BP suggest that the Responders had been involved in or agreed to the terms of the Medical Settlement, including the BELO provision set forth therein.  Rather, BP accurately described the Medical Settlement as the "B3" settlement it had unilaterally agreed to with Plaintiffs.

107.    At no point during the Fairness Hearing did BP indicate that it would be seeking, or was reserving its rights to seek, indemnity or contribution from O'Brien's or NRC with respect to any Plaintiff's invocation of his or her BELO or Opt-Out rights in the future.

### Court Approval of the Medical Settlement

108.    On January 11, 2013, the Court issued an Order and Reasons Granting Final Approval of the [Medical Settlement] (Rec. Doc. 8217) (the "Order and Reasons," annexed hereto as Exhibit M) as well as the Final Approval Order.

109.    In the Order and Reasons, the Court overruled the objections levied by various parties to the Medical Settlement and explained that certain of them lacked standing to object to the settlement.  Ex. M at 71, 90 n.46.  The Court incorporated by reference its December 21, 2012 Order and Reasons concerning BP's Economic and Property Damages Settlement (Rec. Doc. 8138) (annexed hereto as Exhibit N), *id.*, which in turn found that non-settling defendants in the MDL lacked standing to object to the settlement because its terms do not "cause them plain legal prejudice."  Ex. N at 77.

110.   The Court made clear that the BELO provision was a "compromise reached by the Parties," *i.e.*, Plaintiffs and BP, whereby "both sides exchanged valuable consideration related to these issues," including BP's waiver of a variety of defenses and a reduction of what any Plaintiff must prove at any BELO trial.  Ex. M at 85.

111.   The Court further remarked that BP could have sought to avail itself of certain defenses in defending against the "B3" claims as opposed to settling them, including the similar arguments relied upon by O'Brien's and NRC in their Immunity MSJ.  Specifically, the Court noted that the Medical Settlement class members':

> claims on the merits are complicated by various defenses. BP claims immunity under both the [CWA] and the [FTCA], and asserts that Plaintiffs' state and maritime law claims are preempted by federal law because it was following directives from the FOSC to implement a comprehensive federal response scheme created by the [CWA], the Oil Pollution Act, and the National Contingency Plan.  BP would also argue that its decisions related to, for example, the training and protection of workers and that the use of the dispersants were all done with the input and approval of the government, and were therefore reasonable and cannot form the basis for any liability.

Ex. M at 66 n.25.

112.   The Court also noted that 1,747 persons submitted requests to Opt-Out of the Medical Settlement.  Ex. M at 69.

113.   While the Court was considering whether to approve the Medical Settlement from April 18, 2012 through January 11, 2013 (the "Approval Consideration Period"), BP never advised O'Brien's and NRC that it would be seeking indemnity or contribution for any individual "B3" claim (BELO or Opt-Out), whether in whole or in part.

114.     During the Approval Consideration Period, BP never advised O'Brien's and NRC that it was reserving its rights to seek indemnity or contribution from them for certain Plaintiffs' invocation of BELO or Opt-Out rights pursuant to the Medical Settlement, should the Medical Settlement be approved and should those Plaintiffs pursue BELO or Opt-Out litigation in the future.

115.     During the Approval Consideration Period, BP never invoked O'Brien's and NRC as having any future relationship to any litigation pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions.

116.     The Order and Reasons and Final Approval Order with respect to the Medical Settlement were appealed, but the Appellant-Plaintiffs ultimately settled with BP and the appeal was dismissed.

117.     The Medical Settlement was made effective on February 12, 2014.

### The September 24, 2014 Status Conference and Hearing Proceedings

118.     Since the Medical Settlement was made effective, BP has appeared before the Court with respect to disputes concerning its interpretation, and the Court has resolved such disputes.  By way of example, via order dated July 23, 2014 (Rec. Doc. 13179) (the "July 2014 Order," annexed hereto as Exhibit O), the Court agreed with the Claims Administrator's interpretation of the Medical Settlement's language as it concerns settlement pay-outs and what constitutes a SPECIFIED PHYSICAL CONDITION versus a LATER-MANIFESTED PHYSICAL CONDITION within the meaning of the Medical Settlement.  In the July 2014 Order, the Court plainly noted that the Medical Settlement "clearly defines any condition diagnosed after April 16, 2012 as a [LATER-MANIFESTED PHYSICAL CONDITION].  While in some cases a class member may have a condition that fits the definition of a [CHRONIC

CONDITION], if it was not diagnosed by April 16, 2012, it is, by definition, a [LATER-MANIFESTED PHYSICAL CONDITION].  To hold otherwise would invalidate a clear and unambiguous term of the [Medical Settlement]." Ex. O at 6.

119.     On September 24, 2014, Plaintiffs and BP appeared before the Court for a status conference and various hearing proceedings.  One of the motions that was argued was BP's Motion for Reconsideration of the Court's July 2014 Order (Rec. Doc. 13303) (the "Reconsideration Motion").  During the course of argument on the Reconsideration Motion, the Court expressed its concern with respect to the potential breadth of claims that could be pursued pursuant to the Medical Settlement's BELO provision, noting that the potential volume of cases was never truly made clear to the Court at the Fairness Hearing or prior to approval of the Medical Settlement.

120.     During argument on the Reconsideration Motion, among other things, the Court noted:

> [i]t is rather strange . . . that the Court would approve . . . a class settlement that really doesn't settle thousands of claims and requires them to file another lawsuit.  I mean, it doesn't sound like much of a settlement.  Frankly, I've never heard of a settlement which requires you to file another lawsuit.  That's what's causing me problems, I guess, in thinking through this.  It seems like it's going to result in something that I don't believe either party intended . . . .

Sept. 24, 2014 Hr'g Tr. (annexed hereto as Exhibit P) at 41:5-14.

121.     On November 26, 2014, the Court issued its ruling on the Reconsideration Motion (Rec. Doc. 13733) (annexed hereto as Exhibit Q), reaffirming its original ruling but again remarking that the Court was previously under the impression "that the vast majority of exposure cases existing at the time of confection of the [Medical Settlement] would be settled, [but] that

may not be true according to the plain wording of Section II.VV. of the [Medical Settlement]." Ex. Q at 4-5.

### Plaintiffs' Commencement of BELO Litigation Against BP

122.    After the Medical Settlement was made effective, Plaintiffs commenced invoking their BELO rights pursuant to the Medical Settlement's BELO provision, necessarily renewing their "B3" personal injury and exposure claims as against BP.

123.    On December 8, 2014, the Court issued a preliminary order announcing its intention to issue a Case Management Order for litigation pursued pursuant to the Medical Settlement's BELO provision, reiterating that "[n]o BELO lawsuit may name any defendant other than [BPXP] and BP America[.]"  (Rec. Doc. 13787).

124.    Following competing proposals by both BP and Plaintiffs, the Court issued a Case Management Order on January 30, 2015 to govern lawsuits pursued against BP pursuant to the Medical Settlement's BELO provision (the "BELO Proceedings CMO").  (Rec. Doc. 14099).

125.    Before the BELO Proceedings CMO was entered, BP did not advise O'Brien's or NRC that BP would be seeking, or was reserving its rights to seek, indemnity or contribution from them with respect to certain Plaintiffs' claims that had been or could be pursued pursuant to the Medical Settlement's BELO provision.

126.    Before the BELO Proceedings CMO was entered, BP did not involve any of the Responders in strategic discussions with respect to the BELO lawsuits that had been filed or in developing its case management proposals to the Court.   Nor did BP otherwise involve O'Brien's or NRC in determining how best to defend any lawsuit pursued pursuant to the Medical Settlement's BELO provision.

127.    On March 6, 2015, BP filed a Motion to Strike (the "Motion to Strike") with respect to one Plaintiff's demand for a jury trial in connection with his BELO action.  (Rec. Docs. 14237, 14455).  In its Reply in support of the Motion to Strike (annexed hereto as Exhibit R), BP argued that "[c]lass [c]ounsel now seek to have the Court adopt **the fiction that BELO plaintiffs are 'new plaintiffs who are commencing separate new civil actions.'** Their position erases the course charted by the class that led to the [Medical Settlement] and in effect would require the Court to selectively enforce provisions of the [Medical Settlement]."  Ex. R at 4 (footnote omitted) (emphasis added).

128.    In its briefing in support of the Motion to Strike, BP admitted that a Plaintiff invoking BELO rights pursuant to the Medical Settlement was reinvigorating his or her "B3" claim—albeit according to the terms and conditions set forth in the Medical Settlement—and that his or her pursuit of a lawsuit pursuant to the BELO provision did not amount to a "new" claim or convert him or her into a "new" claimant.  (Rec. Docs. 14237-1 & 14455).

### BP's Recent Indemnity Demands for "B3" Claimants

129.    Approximately seven years after the incident aboard the *Deepwater Horizon* that necessitated the DWH Response, more than four years after the Medical Settlement was approved by the Court overseeing the MDL, nearly a year after the Master Immunity Order was entered by the Court, and months after all of the "B3" claims in the MDL asserted against O'Brien's and NRC had been dismissed with prejudice, BP began to demand that O'Brien's indemnify it in connection with exposure-based litigation pursued pursuant to the Medical Settlement's BELO provision.

130.    Via a letter dated March 6, 2017, BP tendered the action captioned *Terry Odom v. BP Exploration & Production Inc., et al.*, No. 16-CV-15974 (E.D. La.) (the "*Odom* Action") to

O'Brien's for indemnity pursuant to Article 11.02.01 of the O'Brien's Bridge Agreement, contending that Ms. Odom worked for an O'Brien's contractor during the DWH Response and thus fell within the O'Brien's "Contractor Group" within the meaning of Article 11.01.03 of the O'Brien's Bridge Agreement. Ms. Odom was a "B3" plaintiff in the MDL and a class member to the Medical Settlement, and accordingly, the *Odom* Action was a lawsuit filed pursuant to the Medical Settlement's BELO provision.

131. O'Brien's promptly declined BP's demand for indemnity as to the *Odom* Action, and BP requested that O'Brien's reconsider its position.

132. BP progressively began to inundate O'Brien's with correspondence notifying O'Brien's that (a) Medical Settlement class members who worked for O'Brien's, either directly or indirectly, during the DWH Response had filed NOIS forms and thus had provided BP notice of their intention to file complaints formally invoking their BELO rights and, in turn, that (b) BP was tendering these claims to O'Brien's pursuant to Article 11.02.01 of the O'Brien's Bridge Agreement.

133. Specifically, via letters dated March 6, 2017, November 29, 2017, March 9, 2018, May 25, 2018, May 29, 2018, August 8, 2018, August 13, 2018, August 28, 2018, October 15, 2018, October 25, 2018, November 9, 2018, December 21, 2018, March 22, 2019, April 19, 2019, May 28, 2019, June 27, 2019, July 25, 2019, August 19, 2019, October 1, 2019, and October 24, 2019 (altogether, "BP Indemnity Demands to O'Brien's"), BP purported to tender hundreds of exposure-based claims relating to the DWH Response to O'Brien's. The materials attached to BP's Indemnity Demands to O'Brien's, which list Plaintiff information for each class member purporting to invoke his or her BELO rights, contain a total of 2,357 entries.

134.    To date, upon information and belief, 1,684 Plaintiffs referenced in BP's Indemnity Demands to O'Brien's have reinvigorated their "B3" claims against BP and filed formal complaints pursuant to the Medical Settlement's BELO provision.

135.    As Medical Settlement class members have at least six months to file a formal complaint after submitting an NOIS, complaints continue to be filed against BP pursuant to the Medical Settlement's BELO provision on a regular basis.   Based on the trajectory of complaint filings to date, O'Brien's expects that most, if not all, of the Plaintiffs referenced in BP's Indemnity Demands to O'Brien's will file formal complaints against BP pursuant to the Medical Settlement's BELO provision.

136.    BP has also begun to tender litigation pursuant to the Medical Settlement's BELO provision to NRC pursuant to Section 9.1 of the NRC Master Agreement.   Via letters dated April 5, 2018, May 25, 2018, May 29, 2018, August 13, 2018, August 28, 2018, September 26, 2018, October 15, 2018, November 16, 2018, December 21, 2018, March 21, 2019, April 19, 2019, May 28, 2019, June 27, 2019, and August 19, 2019 (altogether, "BP's Indemnity Demands to NRC"), BP has purported to tender hundreds of exposure-based claims to NRC.   As with BP's Indemnity Demands to O'Brien's, the materials attached to BP's Indemnity Demands to NRC list Plaintiff information for each class member purporting to invoke his or her BELO rights, and contain a total of 227 Plaintiff entries.

137.    To date, upon information and belief, 165 Plaintiffs referenced in BP's Indemnity Demands to NRC have reinvigorated their "B3" claims against BP and filed formal complaints pursuant to the Medical Settlement's BELO provision.

138.    Like O'Brien's, NRC also expects that most, if not all, of the Plaintiffs referenced in BP's Indemnity Demands to NRC will file formal complaints against BP pursuant to the Medical Settlement's BELO provision.

139.    Nearly two more years after BP began to demand that the Responders indemnify it in connection with exposure-based litigation pursued under the Medical Settlement's BELO provision (and even after Responders filed their original Complaint in this matter), BP demanded that the Responders indemnify it in connection with exposure-based litigation pursued under the Medical Settlement's Opt-Out provision.  Specifically, via letters dated March 11, 2019 and July 19, 2019, BP has purported to tender hundreds more exposure-based claims relating to the DWH Response to the Responders pursuant to Article 11.02.01 of the O'Brien's Bridge Agreement and Section 9.1 of the NRC Master Agreement.  As with BP's Indemnity Demands to O'Brien's and NRC for the BELO claims, the materials attached to BP's Opt-Out indemnity demands to the Responders list Plaintiff information for each class member who invoked his or her Opt-Out rights, and contain a total of 426 Plaintiff entries for O'Brien's and 24 Plaintiff entries for NRC.

140.    BP has confirmed to the Responders that it has similarly requested indemnity for "B3" claims from other responder entities that served as contractors to BP during the DWH Response.  Upon information and belief, BP has purported to tender exposure-based claims pursued pursuant to the Medical Settlement's BELO and Opt-Out provisions to those other contractors.

### *Current Status of "B3" Claimants Exercising Their BELO Rights*

141.    BP has not consulted with the Responders in deciding whether or not to mediate any Medical Settlement class member's claim with respect to a LATER-MANIFESTED

PHYSICAL CONDITION, as contemplated by the Medical Settlement's BELO provision.  BP has not even informed the Responders as to whether it has successfully mediated any such claim.

142.   Claimants referenced in BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC have filed lawsuits in this Court, consistent with the requirements of the Medical Settlement's BELO provision.  However, a number of these individual cases have been transferred to other judicial districts across the country.

143.   At present, exposure-based litigation pursuant to the Medical Settlement's BELO provision that has been tendered to O'Brien's or NRC remains pending in eight judicial districts beyond the Eastern District of Louisiana, including the Southern District of Alabama, the Northern, Middle, and Southern Districts of Florida, the Northern and Southern Districts of Mississippi, and the Eastern and Southern Districts of Texas.  BP has never consulted with the Responders in moving for or stipulating to these venue transfers.

144.   BP has not consulted with the Responders in connection with defending against any Medical Settlement's class member's claim pursued pursuant to the Medical Settlement's BELO provision, including with respect to selecting and retaining counsel, experts, or consultants or determining which defenses to assert and pursue.  To date, BP appears to have hired at least eight different law firms to represent it in connection with these renewed "B3" claims.

145.   In addition, upon information and belief, BP has opposed certain cost-saving measures in litigating the BELO cases, including by opposing the consolidation of BELO cases in at least one transferee district.  *See, e.g.*, Order, *De La Cruz v. BP Expl. & Prod., Inc., et al.*, No. 1:18-CV-00472-TM-N (S.D. Ala. Feb. 5, 2019) (Rec. Doc. 30) (annexed hereto as Exhibit S) at 2 (noting that when the court discussed consolidating ten BELO cases at a scheduling

conference, "[c]ounsel for Plaintiff expressed his client was in favor of consolidation, while counsel for Defendants expressed his clients were not in favor of consolidation").

146.   BP has filed a significant number of Answers to the Complaints filed pursuant to the Medical Settlement's BELO provision, but has not consulted with the Responders in formulating these Answers or determining which affirmative defenses to assert therein, including for those cases tendered in BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC.   In fact, BP has asserted indemnity and contribution as affirmative defenses in its Answers.   BP has also asserted that it cannot be deemed liable for damages caused by the actions of its contractors during the DWH Response, necessarily including O'Brien's and NRC.   BP also appears to be contending that it is entitled to some form of immunity or leniency, based on its asserted affirmative defense that it "complied with applicable laws, regulations, standards, as well as with any directions/instructions of the Unified Command, and that its actions were consistent with the National Contingency Plan." *E.g.*, Answer, *Colston v. BP Expl. & Prod. Inc.*, No. 2:18-CV-9563-CJB-JCW (E.D. La. Nov. 14, 2018) (Rec. Doc. 4 at 8).

147.   BP's Answers to the Complaints filed by claimants referenced in BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC make clear that BP is attempting to preserve its rights to seek common law indemnity and/or contribution from O'Brien's and NRC.

148.   BP has reached settlements with certain "B3" Plaintiffs who invoked their BELO rights under the Medical Settlement and pursued formal exposure-based litigation against BP, including certain Plaintiffs referenced in BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC.   BP did not consult with the Responders in deciding whether or not to settle any such claim, nor did BP consult with the Responders with respect to the settlement's terms or settlement payment to be made.

### *The Parties' Positions on BP's Belated Indemnity Demands*

149.   On March 6, 2017, BP tendered the *Odom* Action to O'Brien's, which was the first time BP tendered any "B3" claim, in whole or in part, to either of the Responders.   BP's Indemnity Demands to O'Brien's followed.

150.   BP seeks indemnity for the *Odom* Action and the claims referenced in BP's Indemnity Demands to O'Brien's under Article 11.02.01 of the O'Brien's Bridge Agreement, under which O'Brien's agreed to defend and indemnify BP in connection with certain personal injury claims, provided that the claim was being asserted by an individual in the O'Brien's "Contractor Group," as that term is defined in Article 11.01.03 of the O'Brien's Bridge Agreement.

151.   The indemnification provision that BP relies on is governed by Article 11.04 of the O'Brien's Bridge Agreement, which provides that the purported indemnitee must provide prompt notice in writing to the indemnitor of any claim for which it seeks defense and indemnification.   O'Brien's and BP also agreed at Article 11.04 that any such written notice "shall state with as much detail as is reasonably practicable the facts and circumstances giving rise to the claim and shall be given as soon as possible after the [purported indemnitee] . . . becomes aware of such claim or proceeding."

152.   O'Brien's and BP further agreed in Article 11.04 of the O'Brien's Bridge Agreement that the indemnitor, as may be applicable, "shall retain control of the conduct of [the] defense" of any claim tendered for indemnity, "including, but not limited to, the selection and management of counsel," and that no party shall settle any claim without prior written consent.

153.   The timely notice provision set forth at Article 11.04 of the O'Brien's Bridge Agreement was part of the bargain in the indemnity agreement reached between BP and

O'Brien's with respect to the DWH Response.  Likewise, the indemnitor rights as to selection of counsel and settlement consent set forth at Article 11.04 of the O'Brien's Bridge Agreement were part of the bargain in the indemnity agreement reached between BP and O'Brien's with respect to the DWH Response.

154.    BP also seeks indemnity from NRC under Article 9.1 of the NRC Master Agreement for the claims subject of BP's Indemnity Demands to NRC.  In the NRC Master Agreement, NRC agreed to indemnify BP from claims "caused by the gross negligence or willful misconduct" of NRC or "its affiliates, officers, directors, employees or subcontractors."  NRC did not agree to defend or indemnify BP in any other context.

155.    On August 29, 2018, O'Brien's rejected BP's demand for indemnity for the claims referenced in BP's Indemnity Demands to O'Brien's and argued that BP's unilateral decision-making regarding how to address the "B3" claims asserted against it in the MDL, necessarily including those asserted by claimants purportedly within the O'Brien's "Contractor Group" within the meaning of Article 11.01.03 of the O'Brien's Bridge Agreement, had unquestionably prejudiced O'Brien's rights and exposed O'Brien's to a greater risk exposure. Indeed, BP's unilateral decision-making with respect to the Medical Settlement has now placed it in the position where, in every single case pursued pursuant to the BELO provision (and in every single case it has tendered to O'Brien's for indemnity), it (1) cannot argue that the Plaintiff's claim is barred because it previously settled that claim via the Medical Settlement (and should have opted out of the Medical Settlement if he or she wanted to preserve a claim); (2) cannot argue that the Plaintiff is improperly splitting their claim or barred from pursuing a second round of litigation for injuries stemming from the same incident or exposure; (3) cannot invoke a number of other affirmative defenses, including those based on timeliness, any statute of

limitations or repose, nor the doctrine of laches; (4) must defend a personal injury claim where exposure has already been conceded (such that the Plaintiff need not prove the most critical element of their cause of action); and (5) must defend a claim where Plaintiff's overall burden of proof has been significantly reduced. O'Brien's also took the position that BP's indemnity demands are untimely and should be rejected pursuant to fundamental fairness principles at this late juncture, particularly now that O'Brien's has been granted immunity with respect to these same claims and dismissed from the MDL with prejudice.

156. On September 26, 2018, NRC rejected BP's demand for indemnity for the claims referenced in BP's Indemnity Demands to NRC. In addition to making the same arguments as O'Brien's, as described in the preceding paragraph, NRC argued that Article 9.1 of the NRC Master Agreement does not include a blanket agreement to cover BP for "all claims or losses" as BP's Indemnity Demands to NRC suggest. Rather, Article 9.1 makes clear that NRC only agreed to indemnify BP for injuries that are caused by NRC or its representatives' "gross negligence or willful misconduct." No such allegations have been or could be made by any Plaintiff in his or her BELO lawsuit against BP, nor has BP provided any evidence of such conduct. Moreover, all of the evidence in the MDL record shows that NRC acted pursuant to the authorization, direction, and ultimate control of the federal government during the DWH Response, and the Court ruled in 2016 that this undisputed evidence entitles NRC to immunity for its actions and role during the DWH Response. NRC also noted that the NRC Master Agreement makes clear at Article 9.1 that NRC owes no defense or indemnity to BP if any claim or loss "occur[s] as a result of [BP's] failure to observe or comply with any applicable law, regulation or lawful authority, or its failure to observe or comply with and fulfill its obligations under this Agreement or as a result of the grossly negligent or willful misconduct of [BP], its

employees or agents, or of third parties." The BELO claims subject of BP's Indemnity Demands to NRC are all alleged (or will be alleged) solely against BP and contend that BP (not NRC) engaged in such conduct during the DWH Response.

157.    On June 29, 2019, the Responders rejected BP's demand for indemnity for the Opt-Out claims. In addition to making the arguments described in paragraphs 151-156 regarding timely notice, ability to control the defense, the Responders' immunity, and exceptions to NRC's indemnity, the Responders argued that the Court had already dismissed certain of the Opt-Out claims with prejudice in its January 31, 2019 Order (Rec. Doc. 25356). The Responders also argued that BP's Opt-Out indemnity demands are particularly untimely given that BP had access to the Claims Administrator's full list of Plaintiffs who opted-out at least by November 2012 and had provided its research and tracking findings for the Opt-Out Plaintiffs to the Responders in August 2013—again, numerous years before seeking indemnity from the Responders.

158.    In response to the Responders' rejection of its indemnity demands, BP has insisted that it promptly provided notice of the claims tendered in BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC, the Responders should have objected to the Medical Settlement if they did not want to indemnify BP for any claims pursued pursuant to the Medical Settlement's BELO provision, and their inclusion in the release to the Medical Settlement somehow negates any prejudice they now claim. In addition, BP has argued that claimants pursuing litigation pursuant to the Medical Settlement's BELO provision are afforded a different status from those Plaintiffs that formally opted out of the Medical Settlement, who in turn are the purported "B3" Plaintiffs in the MDL. As such, according to BP, the claims it has tendered to the Responders are "new" claims and not "B3" claims, mooting all of the Responders' arguments with respect to the sequence of events as to the "B3" claims in the MDL.

159.    O'Brien's and NRC have challenged BP's contention that the claims subject of BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC are "new" claims and that they should have—or could have—objected to the Medical Settlement back in 2012. O'Brien's and NRC have highlighted that they had no standing to object to the Medical Settlement because they were not parties or signatories thereto and its terms did not cause them plain legal prejudice.  As such, they were not any differently situated from the other non-settling defendants in the MDL whose objections to the Medical Settlement were overruled in the Order and Reasons.  O'Brien's and NRC have also rejected BP's attempt to unilaterally redefine what constitutes a "B3" claim or a "B3" Plaintiff in the MDL.  That is, the Plaintiffs subject of BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC are not "new" claimants, but rather, plaintiffs pursuing "round two" of the very same personal injury and exposure claims BP had notice of back in 2010.

160.    BP has also suggested that it preserved its right to seek indemnity or contribution from O'Brien's and NRC in the Medical Settlement.  Upon information and belief, BP is relying upon the language that states that "[e]xcept as provided in Section XXIX.L, this RELEASE is not intended to prevent BP from exercising its rights of contribution, subrogation, or indemnity under any law."  Ex. D at Section XVI(K).  It is the Responders' position that this vague statement is inapplicable and/or inoperable, preserves no such right as to the Responders on its face, and cannot impose any obligations on the Responders or grant additional rights to BP as BP contends.

161.    In seeking indemnity from the Responders, BP has made clear that it (a) is not requesting that O'Brien's and NRC defend BP in the individual cases that had been filed pursuant to the Medical Settlement's BELO or Opt-Out provisions, but rather, merely seeking

reimbursement for litigation costs and expenses, and (b) would like to both control the defense of these cases and employ its selected litigation counsel.  As such, it has ignored O'Brien's rights pursuant to Article 11.04 of the O'Brien's Bridge Agreement as well as the Responders' rights as the purported indemnitors.  And while BP has conceded that the NRC Master Agreement does not provide for the blanket indemnity that BP's Indemnity Demands to NRC request, it has continued to request indemnity from NRC for purported conduct that the Court has already ruled there is no evidence to support.

### *The Parties' Positions on "Additional Insured" Obligations*

162.   BP recently began claiming that O'Brien's did not properly name BP as an additional insured for "Comprehensive General Liability Insurance . . . with minimum limits of US$2,000,000 per occurrence" as allegedly required under the O'Brien's Master Agreement. Dkt. 32 (Amended Counterclaims) ¶¶ 30-31, 113-115.  Notably, BP brings this claim *more than 15 years* after that alleged contractual requirement was put in place.  BP also claims that the O'Brien's Master Agreement required O'Brien's to name BP as an additional insured not just on the policies required by the contract but also broadly on *"all policies"* that O'Brien's decided to obtain in its discretion.  BP claims that this includes the five policies identified in paragraph 85 of its Amended Counterclaims and Third-Party Complaint (Dkt. 32).  BP further claims that, if it is not an additional insured on these policies, then O'Brien's "assumes the position of the insurer of all covered losses" and must directly insure BP for "hundreds of millions of dollars of insurance coverage."  *Id.* ¶¶ 113-115.

163.   O'Brien's, on the other hand, contends that, to the extent the Court determines that BP is not an additional insured, any contractual obligation O'Brien's may have had to name BP as an additional insured on comprehensive general liability coverage is limited on the face of

the contract to $2 million, and therefore any obligation O'Brien's may have as a direct insurer of BP is limited to $2 million.

164.    An actual controversy of a justiciable nature thus exists between BP and O'Brien's regarding O'Brien's obligations, if any, as a direct insurer of BP.

## CAUSES OF ACTION

### Count One:  Declaratory Judgment Regarding Indemnification

165.    The Responders restate, re-allege, and incorporate by reference each of the allegations set forth above as if fully set forth herein.

166.    From the outset of the MDL, the Court, the Responders, and BP have understood and acknowledged that the "B3" plaintiff population encompasses all personal injury and similar claims resulting from exposure to oil, dispersants, and other substances during the DWH Response.   While some "B3" Plaintiffs became Medical Settlement class members—and necessarily have the right to pursue BELO litigation against BP with respect to an injury or condition diagnosed after April 16, 2012—this does not alter or nullify their "B3" Plaintiff status.   Nor does it convert their invocation of BELO rights pursuant to the Medical Settlement and corresponding exposure-based BELO lawsuit against BP into a "new" claim.   These are simply "B3" claimants exercising their BELO rights under the Medical Settlement.

167.    All of the claimants referenced in BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC (BELO and Opt-Out) are "B3" Plaintiffs that were known, or should have been known, to BP in the 2010-2011 timeframe.   As such, BP should have advised O'Brien's and NRC of its intent to seek indemnity with respect to these claims years ago—and long before it ever unilaterally agreed to the terms and conditions set forth in the Medical Settlement, including its BELO or Opt-Out provisions.

168.    BP never advised the Responders that it would be seeking indemnity for any individual "B3" claim (BELO or Opt-Out), whether in whole or in part, until long after the Immunity Orders had been entered and the "B3" claims against O'Brien's and NRC were dismissed with prejudice.  There is no excuse for BP's significant delay in providing notice, which robbed O'Brien's and NRC of a number of rights as the purported indemnitors, including the ability to undertake a more coordinated strategy with respect to defending against the "B3" claims asserted against BP, O'Brien's, and NRC in the MDL.

169.    BP disregards the relevant history of the MDL proceedings, including that discussed in the preceding three paragraphs, and recasts the claims it has tendered to the Responders for indemnity as brand-new personal injury claims (and not "B3" claims).

170.    It is the Responders' position that BP's unilateral decision-making, which remains ongoing today, and blatant disregard of O'Brien's and NRC's rights operates to (1) bar any demands for indemnity or contribution, whether asserted under contract, common law, or otherwise, at this late juncture, and (2) discharge any contractual indemnity obligation on the part of O'Brien's and NRC that may have once existed with respect to any litigation pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions.  The Responders seek a declaration from this Court to this effect.

171.    It is also the Responders' position that the Medical Settlement operates to extinguish any right to seek indemnity or contribution now from O'Brien's or NRC with respect to any benefits afforded to any Medical Benefits class member, including the ability to invoke BELO rights and pursue a second round of litigation against BP.  The Responders seek a declaration that BP is solely responsible for everything it agreed to in the Medical Settlement,

including for defending itself against any exposure-based litigation pursued by a Medical Settlement class member pursuant to the BELO or Opt-Out provisions.

172.   The Responders also contend that this Court's prior grant of immunity as to O'Brien's and NRC bars any indemnity or contribution claim against them in related lawsuits, necessarily including the BELO or Opt-Out litigation against BP as contemplated by the Medical Settlement.  The Responders seek a declaration that all indemnity or contribution claims relating to the "B3" claims in the MDL, whether asserted or unasserted, known or unknown, contingent or otherwise, are barred from proceeding as against O'Brien's and NRC, expressly including any litigation pursued against BP pursuant to the Medical Settlement's BELO or Opt-Out provisions.

173.   Contrary to the Responders' positions set forth in paragraphs 166-168 and 170-172, BP contends that the claims subject of BP's Indemnity Demands to O'Brien's and BP's Indemnity Demands to NRC are brand new, timely asserted, and that its indemnity rights continue to exist notwithstanding the Medical Settlement and the entire record in the MDL.

174.   An actual and justiciable controversy thus exists between BP and the Responders that is ripe for adjudication.  The dispute between the parties is by no means hypothetical, but is rather very real and involves potentially significant liability.

175.   Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, this Court is authorized to resolve this dispute and provide the declaratory relief requested, and resolution of this dispute will aid in the termination of this controversy by making clear to all interested parties that BP, and not any of the Responders, is responsible for the financial burden of defending against exposure-based litigation pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions.

176.     In the absence of the declarations sought herein, BP will continue to demand indemnity and/or contribution from O'Brien's and NRC, and there will continue to be uncertainty as to whether the Responders may be financially responsible for significant exposure-based litigation resulting from the DWH Response.  There is no basis to wait until each individual claim pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions has been tried for the Responders to be heard and granted such relief.  To do so would be inefficient, waste judicial and party resources, and would not provide any finality as to whether BP's indemnity or contribution rights vis-à-vis the "B3" claims pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions have been extinguished.

177.     There is no other pending litigation between the Responders and BP with respect to indemnification or contribution obligations vis-à-vis any "B3" claim, in whole or in part, or vis-à-vis the Medical Settlement.

178.     This Court is well familiar with the history of the MDL proceedings, created the "B3" bundle of claims and approved the Medical Settlement, and is best positioned to resolve this dispute between the parties.  Having this Court hear this controversy now serves the interests of judicial economy.  It is also a convenient forum for the parties, as the Responders and BP have been named defendants in the MDL as it concerns the DWH Response, and is the forum that BP agreed in the Medical Settlement should be where disputes relating to the Medical Settlement are heard.

179.     This Court also expressly sought to retain continuing and exclusive jurisdiction over all disputes arising out of or relating to the Medical Settlement, including the interpretation and ultimate impact thereof relating to the claims asserted by the "B3" plaintiff population in the MDL.  This necessarily will include determining who is financially responsible for the BELO

portion of any individual "B3" claim asserted against BP, who is financially responsible for any Opt-Out "B3" claim asserted against BP, and whether the Medical Settlement operated to bar any indemnity or contribution claims by BP with respect to BELO or Opt-Out litigation as against O'Brien's and NRC.

180.    This controversy is of sufficient immediacy, reality, and ripeness to warrant the issuance of a declaratory judgment at this time so the parties can avoid further disputes.  This Court has already ruled on whether indemnity obligations exist amongst other MDL defendants and it should do the same here.  (Rec. Docs. 5446, 5493).

**Count Two:  Declaratory Judgment Regarding "Additional Insured" Status**

181.    The Responders restate, re-allege, and incorporate by reference each of the allegations set forth above as if fully set forth herein.

182.    The O'Brien's Master Agreement's provision of "Comprehensive General Liability Insurance . . . with minimum limits of US$2,000,000 per occurrence" (Dkt. 32 ¶ 30) makes clear that any obligation to name BP as an additional insured on comprehensive general liability coverage is limited on the face of the contract to $2 million.

183.    BP claims that O'Brien's did not properly name BP as an additional insured for the comprehensive general liability insurance of at least $2 million under the O'Brien's Master Agreement.  Dkt. 32 ¶¶ 30-31, 113-115.  BP also claims that the O'Brien's Master Agreement required O'Brien's to name BP as an additional insured not just on the policies required by the contract but also broadly on *"all policies"* that O'Brien's decided to obtain in its discretion.  BP claims that this includes the five policies identified in paragraph 85 of its Amended Counterclaims and Third-Party Complaint (Dkt. 32).  BP further claims that, if it is not an additional insured on these policies, then O'Brien's "assumes the position of the insurer of all

covered losses" and must directly insure BP for "hundreds of millions of dollars of insurance coverage." *Id.* ¶¶ 113-115.

184.    O'Brien's, on the other hand, contends that, to the extent the Court determines that BP is not an additional insured, any contractual obligation O'Brien's may have had to name BP as an additional insured on comprehensive general liability coverage is limited on the face of the contract to $2 million, and therefore any obligation O'Brien's may have as a direct insurer of BP is limited to $2 million.

185.    An actual and justiciable controversy thus exists between BP and O'Brien's that is ripe for adjudication.  The dispute between the parties is by no means hypothetical, but is rather very real and involves potentially significant liability.

186.    Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, this Court is authorized to resolve this dispute and provide the declaratory relief requested, and resolution of this dispute will aid in the termination of this controversy.  In the absence of the declaration sought herein, there will continue to be uncertainty as to whether O'Brien's may be financially responsible for significant exposure-based litigation resulting from the DWH Response.

187.    There is no other pending litigation between O'Brien's and BP with respect to insurance obligations vis-à-vis any "B3" claim, in whole or in part, or vis-à-vis the Medical Settlement.

188.    There is no basis to wait for O'Brien's to be heard and granted relief on its insurance obligations until each individual claim pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions has been tried.  To do so would be inefficient, waste judicial and party resources, and not provide the finality necessary to resolve this matter.

189.   This Court is also a convenient forum for a determination of this insurance dispute between O'Brien's and BP because BP already has invoked this forum to resolve the insurance issues by bringing a breach of contract claim in this case related to its additional insured status, and because many of the "B3" cases (BELO and Opt-Out) that insurance may apply to are being filed in the first instance in the Eastern District of Louisiana, O'Brien's and BP have been named defendants in the MDL as it concerns the DWH Response, and BP agreed in the Medical Settlement that this forum should be where disputes relating to the Medical Settlement are heard.

190.   This controversy is of sufficient immediacy, reality, and ripeness to warrant the issuance of a declaratory judgment at this time so the parties can avoid further disputes.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Responders demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, the Responders respectfully request that the Court enter a judgment as follows:

(a)   Declare that any contractual or common law indemnity demand by BP to O'Brien's and NRC with respect to any "B3" claim in the MDL is untimely and thus inoperative, including with respect to any claim pursued by a Medical Settlement class member pursuant to the Medical Settlement's BELO or Opt-Out provisions;

(b)   Declare that BP's course of conduct in the MDL, including its unilateral decisions regarding how to address the personal injury and exposure claims asserted against it in the MDL, have prejudiced O'Brien's and NRC's rights and materially impacted their

ability to fully and vigorously defend any such personal injury and exposure claim tendered by BP for indemnity pursuant to the O'Brien's Bridge Agreement or the NRC Master Agreement;

(c)   Declare that BP deprived, and continues to deprive, O'Brien's and NRC of the right to control the defense in connection with the personal injury and exposure claims it now seeks to tender for indemnity;

(d)   Declare that the agreements and concessions made by BP in the Medical Settlement with respect to any BELO proceeding, including but not limited to the waiver of defenses and limiting issues, elements, and Plaintiff's proof for any trial, prejudice O'Brien's and NRC and operate to bar any related demands by BP for indemnity and/or contribution;

(e)   Declare that the agreements and concessions made by BP in the Medical Settlement with respect to any BELO proceeding, including but not limited to the waiver of defenses and limiting issues, elements, and Plaintiff's proof for any trial, prejudice O'Brien's and NRC and operate to discharge any contractual or common law indemnity obligation that may be owed to BP, including under the O'Brien's Bridge Agreement and the NRC Master Agreement;

(f)   Declare that the approval of the Medical Settlement in and of itself operated to extinguish any indemnity or contribution claim BP might have had against any of the Responders with respect to any "B3" claim (BELO or Opt-Out) in the MDL, whether asserted under contract, common law, or otherwise;

(g)   Declare that BP is solely responsible for all benefits to class members it unilaterally agreed to in the Medical Settlement, including but not limited to defending itself against

any and all exposure-based litigation pursued by a Medical Settlement class member pursuant to the Medical Settlement's BELO provision;

(h)     Declare that O'Brien's and NRC owe no indemnity or contribution to BP in connection with any "B3" claim, including any such claim pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions;

(i)     Declare that all indemnity or contribution claims relating to the "B3" claims in the MDL, whether asserted or unasserted, known or unknown, contingent or otherwise, are barred from proceeding as against O'Brien's and NRC in light of this Court's prior derivative immunity and implied preemption rulings in the MDL, expressly including any litigation pursued against BP pursuant to the Medical Settlement's BELO or Opt-Out provisions;

(j)     Declare that O'Brien's and NRC are free from all liability or financial burden associated with any "B3" claim, including any such claim pursued pursuant to the Medical Settlement's BELO or Opt-Out provisions;

(k)     Declare that, to the extent the Court determines that BP is not an additional insured, any contractual obligation O'Brien's may have had to name BP as an additional insured on comprehensive general liability coverage is limited on the face of the contract to $2 million, and therefore any obligation O'Brien's may have as a direct insurer of BP is limited to $2 million;

(l)     Award costs and expenses incurred in this action, including all legal fees; and

(m)    Award such other and further relief as the Court may deem just and proper.

Dated: December 11, 2019

Respectfully submitted,

_/s/ Jeremy T. Grabill_

| | |
|---|---|
| Ivan M. Rodriguez (LA #22574) | Michael J. Lyle (DC #475078, IL #6199227) |
| Gary A. Hemphill (LA #6768) | (Trial Attorney) (_pro hac vice_) |
| Jeremy T. Grabill (LA #34924) | Eric C. Lyttle (DC #482856) (_pro hac vice_) |
| PHELPS DUNBAR LLP | David Needham (DC #1017372) (_pro hac vice_) |
| 365 Canal Street, Suite 2000 | QUINN EMANUEL URQUHART & |
| New Orleans, LA 70130-6534 | SULLIVAN, LLP |
| Telephone: 504-566-1311 | 1300 I Street NW, Suite 900 |
| Facsimile: 504-568-9130 | Washington, DC 20005 |
| ivan.rodriguez@phelps.com | Telephone: (202) 538-8000 |
| gary.hemphill@phelps.com | Facsimile: (202) 538-8100 |
| jeremy.grabill@phelps.com | mikelyle@quinnemanuel.com |
| | ericlyttle@quinnemanuel.com |
| | davidneedham@quinnemanuel.com |

Attorneys for O'BRIEN'S RESPONSE
MANAGEMENT, L.L.C. and NATIONAL
RESPONSE CORPORATION