UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| O'BRIEN'S RESPONSE MANAGEMENT, L.L.C., et al. | * | CIVIL ACTION |
| | * | No. 19-CV-01418 |
| v. | * | SECTION: J(2) |
| BP EXPLORATION & PRODUCTION INC., et al. | * | JUDGE BARBIER |
| | * | MAG. JUDGE WILKINSON |

## ORDER & REASONS

Before the Court are cross motions for judgment on the pleadings under Rule 12(c). (Rec. Docs. 58, 59, 60). These motions present two overarching questions: First, are O'Brien's Response Management, L.L.C. ("O'Brien") and National Response Corporation ("NRC," and together with O'Brien, "Responders") contractually required to indemnify BP Exploration & Production Inc. and BP America Production Company (together, "BP") against personal injury claims by the Responders' employees (and the Responders' subcontractors' employees)? Second, is BP an additional insured on two of O'Brien's insurance policies? For the reasons explained below, the Court answers both in the negative.

### I. BACKGROUND

**A. The DEEPWATER HORIZON/Macondo Well Oil Spill, the Responders' Contracts, and the Cleanup Workers' Chemical Exposure Claims**

On April 20, 2010, a blowout, explosion, and fire occurred aboard the semi-submersible drilling rig DEEPWATER HORIZON as it was in the process of temporarily abandoning a well, known as Macondo, that it had drilled some 50 miles

off the coast of Louisiana. These events resulted in a massive oil spill in the Gulf of Mexico. BP, the majority owner of the well and a designated "responsible party" under the Oil Pollution Act of 1990, 33 U.S.C. § 2701, et seq., engaged the Responders to clean up the affected area.

Each of the Responders had a contract with BP. BP's contract with O'Brien ("the O'Brien Contract," Rec. Docs. 59-3 & 59-5) contained reciprocal indemnity provisions that required O'Brien and BP to indemnify each other against personal injury claims by employees in the indemnitor's "group," regardless of who may be at fault. (O'Brien Contract §§ 11.02.01, 11.03.01). The O'Brien Contract also required O'Brien to maintain certain types of insurance and name BP as an additional insured. (*Id.* §§ 12.01, 12.02).

The contract between NRC and BP ("the NRC Contract," Rec. Doc. 59-4) also had an indemnity provision, but its terms were very different from the O'Brien Contract. Specifically, NRC was required to indemnify BP only to the extent a claim was caused by NRC's gross negligence or willful misconduct. (NRC Contract § 9(1)). Meanwhile, BP agreed to indemnify NRC against any claim to the extent it was caused by BP's failure to comply with applicable law, a term of the agreement, or BP's gross negligence or willful misconduct. (*Id.* § 9(2)(a)). Furthermore, the NRC Contract stated that

> [NRC] shall be entitled to the protection of Responder Immunity Law and nothing herein shall be construed to allow [BP] to recover by way of contribution, indemnity or otherwise from [NRC] . . . any amounts for which [BP] is liable to or has paid to third parties and for which [NRC] would have no liability under the Responder Immunity law applicable in the jurisdiction where the Discharge and/or Response Activities have

2

occurred.

(*Id*. § 7(4)). "Responder Immunity Law" is defined in the NRC Contract as "Federal Law or State Law which provides immunity from liability to those who respond to Discharges for the purpose of attempting to contain and remove Oil from the water, beaches or shoreline." (*Id*. § 1). Finally, the NRC Contract did not require NRC to name BP as an additional insured on any contracts, unlike the O'Brien Contract.

The Responders employed, directly or through subcontractors, thousands of workers to perform the cleanup. In the summer of 2010, cleanup workers began to file lawsuits claiming that they were exposed to oil and/or other chemicals during the response that caused them to develop various illnesses or injuries.[1] Thousands of cleanup workers eventually would make similar claims. Some of these claims would eventually give rise to the instant dispute over contractual indemnification and BP's status as an additional insured.

### B.    MDL 2179 and the B3 Claims

Multidistrict Litigation No. 2179 ("MDL 2179" or simply "MDL") was created and assigned to this Court in August of 2010. Nearly all federal cases relating to the DEEPWATER HORIZON/Macondo Well disaster have been consolidated with the MDL.[2] In October of 2010, the Court established eight separate "pleading bundles"

---

[1] Some cleanup workers also brought claims for non-exposure physical injuries, such as a slip and fall on a vessel. These types of claims make up only a small percentage of the total cleanup worker claims, however. Therefore, the Court focuses on the chemical exposure claims.

[2] The instant case was initially consolidated with MDL 2179, but was deconsolidated when the Court granted the Responders' motion to lift the MDL stay. (Rec. Doc. 7). The Court took the extra step of deconsolidation not because this case is unrelated to the MDL, but because the Court thought it better for organizational purposes if the filings for this matter were made in its individual docket, 19-1418, rather than scattered across the voluminous master docket for the MDL, 10-md-2179.

for different categories of claims to facilitate the effective administration of the MDL. (No. 10-md-2179, Rec. Doc. 569). One of these was the "B3 bundle," defined to include "all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010." (No. 10-md-2179, Rec. Doc. 983 at 2). "B3 plaintiff/claim/case" refers to a plaintiff, claim, or case in this bundle. In December of 2010, the Plaintiffs' Steering Committee ("PSC") filed the "B3 Master Complaint," which alleged, inter alia, chemical exposure personal injury claims on behalf of cleanup workers and other individuals, and named BP, the Responders, and others as defendants. (No. 10-md-2179, Rec. Docs. 881, 1812). Plaintiffs could join the B3 Master Complaint by filing a "short form joinder" with the Court. (10-md-2179, Rec. Docs. 982 & 983 at 4). Thousands did. (*See generally* No. 10-8888). Plaintiffs who filed their own complaints that alleged claims that met the B3 definition were also deemed to be within the B3 bundle.

In 2010 and 2011, the Responders demanded that BP indemnify them against some of the B3 claims pursuant to their respective contracts. In May of 2011, BP and the Responders came to an agreement whereby BP reimbursed the Responders for legal fees and expenses for certain B3 claims. In contrast, BP did not demand indemnification from the Responders at this time. It would not begin to do so until 2017.

    **C.    The Medical Settlement and the BELO Cases**

In 2012, BP and the PSC (who later became Class Counsel) agreed to the Medical Benefits Class Action Settlement Agreement ("Medical Settlement" or simply

4

"the Settlement"), which was intended to resolve many of the chemical exposure claims in the B3 bundle. (10-md-2179, Rec. Doc. 6427). Cleanup workers were included in settlement class unless they opted out. Under the Settlement, certain conditions or illnesses that were diagnosed before April 16, 2012—known as "Specified Physical Conditions" or "SPC"—were paid a particular amount pursuant to a compensation matrix. Conditions that are diagnosed after April 16, 2012 are not paid under the SPC matrix. Instead, the Medical Settlement permits the class member to file a new individual lawsuit against BP for such "later-manifested" illnesses through a process known as the Back-End Litigation Option ("BELO"). A BELO lawsuit is subject to a number of special rules and procedures, some which are discussed later in this opinion.

The Court approved the Medical Settlement in January of 2013. (Rec. Docs. 8217, 8218). It became effective in February of 2014, when the last appeal was voluntarily dismissed. The first BELO lawsuit was filed in December of 2014. (*Wilson v. BP*, No. 14-2730). BELO cases slowly trickled in for the next few years. Then, 2018 brought a surge of BELO cases that continued through much of 2019. To date, around 4,700 BELO cases have been filed. New BELO cases continue to be filed, though at a much lower rate than occurred in 2018-2019.

The Responders are not signatories to the Medical Settlement, nor did they participate in its negotiation. The Responders are, however, listed among the Settlement's "Released Parties," meaning class members may not sue the Responders for claims released by the Settlement, particularly chemical exposure personal injury

5

claims. Class members are also barred from suing the Responders in a BELO lawsuit; only BP may be named as a defendant. Nevertheless, the Medical Settlement purports to preserve BP's ability to seek indemnification from another entity. (*See* Medical Settlement § XVI.K ("Except as provided in Section XXIX.L, this RELEASE is not intended to prevent BP from exercising its rights of contribution, subrogation, or indemnity under any law.")).

### D. B3 Claims Remaining After the Medical Settlement

Not all B3 claims were resolved by the Medical Settlement. Notably, cleanup workers who opted out in favor of pursuing their claims through litigation remained part of the B3 bundle.

As mentioned, many B3 claims were asserted directly against the Responders. The Responders (along with other entities involved in the oil spill response) argued that they were entitled to derivative immunity under the Clean Water Act and the Federal Tort Claims Act. The Court first addressed these arguments in 2011, when it ruled on motions to dismiss the B3 Master Complaint. (No. 10-md-2179, Rec. Doc. 4209). The Court held that the Responders' defenses, although certainly plausible, were not established on the face of the complaint and therefore could not succeed on a motion to dismiss. The Responders renewed their arguments through motions for summary judgment, which the Court granted in 2016. (No. 10-md-2179, Rec. Docs. 21406, 15853). Consequently, the B3 plaintiffs' claims against the Responders were dismissed. B3 claims against BP, however, remained.

In 2017, the Court issued Pretrial Order No. 63, which focused on the remaining B3 cases. (No. 10-md-2179, Rec. Doc. 22295). Noting that the B3 Master Complaint had served its purpose, the Court dismissed it and required all remaining plaintiffs in the B3 bundle (i.e., plaintiffs with B3 claims that were not released by the Medical Settlement) to file a sworn statement regarding the status of their claim and, to the extent the plaintiff had not already done so, an individual lawsuit. Around 1,000 B3 plaintiffs remained after the PTO 63 process was complete. (No. 10-md-2179, Rec. Doc. 24268). In 2018, the Court issued Pretrial Order No. 66, which required the B3 plaintiffs to complete and serve a particularized statement of claim. Pretrial Order No. 68, issued in October of 2019, required B3 plaintiffs and BP to produce certain documents to one another.

### E. BP Demands Indemnity From the Responders; Litigation Results

In March of 2017, BP tendered a BELO case, *Odom v. BP*, No. 16-15974, to O'Brien and demanded indemnification pursuant to the O'Brien Contract. This was the first time BP demanded indemnification from either of the Responders. Many more tenders would follow. Two years later, in March of 2019, BP tendered the first B3 cases to the Responders (i.e., claims by cleanup workers that opted out of the Medical Settlement). In total, BP has tendered approximately 2,225 cases to O'Brien (consisting of 1,800 BELO cases and 425 B3 cases) and approximately 225 cases to NRC (consisting of 200 BELO cases and 25 B3 cases). Also in 2019, BP claimed for the first time to be an additional insured on certain insurance policies maintained by O'Brien.

The Responders refused BP's tenders, and O'Brien's insurer, Navigators Insurance Company ("Navigators"), refused to cover BP as an additional insured. In February of 2019, the Responders filed this action praying for a declaratory judgment that they do not owe BP indemnity. (Rec. Doc. 48). BP counterclaimed against the Responders (Rec. Docs. 32) and filed a third party claim against Navigators (Rec. Doc. 32). Specifically, BP (1) brings a breach of contact claim against O'Brien for refusing to indemnify BP, (2) seeks a declaratory judgment that NRC must indemnify BP if a factfinder finds gross negligence or willful conduct by NRC, (3) brings a breach of contract claim against Navigators for failing to provide insurance coverage to BP, and, (4) if the Court finds that Navigators does not owe coverage to BP, a breach of contract claim against O'Brien failing to name BP as an additional insured.[3]

In accordance with the Court's case management order (Rec. Doc. 43), the Responders, BP, and Navigators each filed motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Rec. Docs. 58, 59, 60). The Court has considered the these motions and the parties' responses (Rec. Doc. 61, 62, 63) on the briefs.

## II.  LEGAL STANDARD

A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citation omitted). A court can take judicial notice of any fact that is "not subject to reasonable

---

[3] BP also asserted a claim for unjust enrichment against the Responders, which the Court dismissed on a Rule 12(b)(6) motion. (Rec. Doc. 57).

dispute" and is either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting Fed. R. Evid. 201(b)). A court may also consider exhibits to the pleadings or matters incorporated by reference in the pleadings. *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 834 (E.D. Tex. 2014). Courts routinely resolve contractual disputes through cross-motions for judgment on the pleadings when the dispute can be resolved as a matter of law. *See, e.g., Regency Title Co., LLC v. Westchester Fire Ins. Co.*, 5 F. Supp. 3d 836 (E.D. Tex. 2013).

The parties agree that Texas law applies to the O'Brien Contract, the NRC Contract, and the insurance policies.

### III.    DISCUSSION

#### A.    NRC Is Not Required to Indemnify BP Against Any Claims

As mentioned above (*supra* Part I(A)), the NRC Contract stated that NRC would not owe BP contractual indemnity if NRC was held to be have no liability under "Responder Immunity Law." In 2016, the Court determined that NRC had no liability under "Responder Immunity Law." (*See supra* Part I(D)). Accordingly, under no circumstances is BP entitled to indemnity from NRC.

#### B.    O'Brien Is Not Required to Indemnify BP Against the BELO Cases

BP demanded that O'Brien indemnify it against approximately 1,800 BELO cases.

9

The O'Brien Contract made O'Brien's indemnification obligation subject to the express requirement that BP obtain O'Brien's written consent before it settled any claims. (O'Brien Contract §§ 11.02, 11.04). The Contract also required that BP "promptly" notify O'Brien in writing of any claim that BP believed was entitled to indemnification. (*Id.*). There is a strong argument that a violation of either of these requirements would void O'Brien's duty to indemnify, regardless of whether the violation caused prejudice to O'Brien. *See Gandy v. Burton*, No. H-12-1883, 2013 WL 2902786, at *3 (S.D. Tex. 2013) (prejudice need not be shown for a non-insurance indemnity contract when the indemnitee violated a condition precedent). In any case, the Court finds that BP's agreement to the Medical Settlement not only violated the consent-to-settle and prompt notice provisions, but also caused prejudice to O'Brien.

As mentioned above, the Medical Settlement paid certain claims that were diagnosed before April 16, 2012 pursuant to the SPC matrix. Class members who are diagnosed with an illness after April 16, 2012, are allowed to pursue that claim through the BELO process. (Medical Settlement § VIII). Under this process, the class member first must file a Notice of Intent to Sue ("NOIS") with the Claims Administrator within four years of the date of diagnosis. If the Claims Administrator approves the NOIS, BP is given 30 days to elect to mediate the claim. If BP declines, the class member then has 6 months to file a BELO lawsuit in this Court.

The BELO lawsuit itself is subject to a number of conditions. Relevant here are the following: BP cannot raise a defense based on untimeliness (such as statute of limitations, prescription, or laches), nor can it raise a defense based on splitting a

cause of action. The Court agrees with O'Brien that BP's unilateral waiver of these two defenses caused it prejudice.[4]

BP argues that O'Brien could have, but did not, object to the Settlement when it was going through the approval process in 2012. However, the fact that O'Brien could have objected after an agreement was reached hardly satisfies the express contractual requirement that BP obtain O'Brien's consent before it agrees to a settlement. Furthermore, O'Brien persuasively argues that prior to 2017 there was nothing to indicate that BP would ever call upon it to indemnify BP for any claim—SPC or BELO—that was included in the Medical Settlement. After all, O'Brien is listed among the numerous "Released Parties" in the Settlement; BP did not seek indemnification from O'Brien prior to the Medical Settlement (nor has it ever sought indemnification for the SPC claims), even though O'Brien did seek and received indemnification from BP during that time; and the provision that purports to preserve BP's indemnification rights is generic.[5] Given this, it's no surprise that O'Brien did not object to the Settlement.

If prior to the confection of the Medical Settlement BP had alerted O'Brien to the fact that it would one day call upon O'Brien to indemnify BP against BELO claims, then O'Brien might very well have demanded a place at the negotiating table

---

[4] Although the Medical Settlement does impose a time limit on BELO cases, it is longer than what would apply under maritime law (3 years from discovery) or Louisiana law (1 year), as class members are given four years from the date of diagnosis to file the NOIS, plus another 6 months to file the actual BELO complaint once the Claims Administrator gives notice that BP did not elect to mediate. The Court notes that it has frequently been the case that BELO plaintiffs take nearly the full 4 years to file a NOIS and nearly the entire 6 months to file the BELO lawsuit.

[5] "Except as provided in Section XXIX.L, this RELEASE is not intended to prevent BP from exercising its rights of contribution, subrogation, or indemnity under any law." (*See* Medical Settlement § XVI.K).

11

or at least objected to the Settlement's terms during the approval process. But BP did not do this, hence its notice was not prompt and, moreover, a violation of the consent-to-settle provision. And the fact is the concessions BP made with respect to the BELO cases did cause prejudice to O'Brien.[6]

Accordingly, the Court finds that O'Brien is not required to indemnify BP against the BELO cases.

### C. O'Brien Is Not Required to Indemnify BP Against the B3 Cases

BP demanded that O'Brien indemnify it against approximately 425 B3 cases.

BP admits that "it is not requesting that the Responders take responsibility for the defense of B3 . . . claims, and that BP believe its continued control of the defense of these claims is in all the parties' best interest." (BP Answer ¶ 160, Rec. Doc. 52). Regardless of BP's beliefs about O'Brien's best interests, its action violates the express requirement in the O'Brien Contract that O'Brien, as indemnitor, "shall retain control of the conduct of such defense, including, but not limited to, the selection and management of counsel." (O'Brien Contract § 11.04).

Additionally, BP did not tender the B3 claims until March of 2019. Since the beginning of this MDL (August of 2010), the parties have been aware, at least in a general sense, that cleanup workers claimed to have suffered injuries because of exposure to oil and/or dispersant. As mentioned, all cleanup workers were class

---

[6] But for the fact that the Court has already determined that NRC does not have to indemnify BP for any claims (*see supra* Part III(A)), the Court would find that BP's agreement to the Medical Settlement similarly prejudiced NRC, voiding NRC's duty to indemnify BP against the BELO claims. *See Hiern v. St. Paul-Mercury Indem. Co.*, 262 F.2d 526, 529 (5th Cir. 1959) (requiring that an indemnitee do nothing to prejudice the rights of the indemnitor, even if not expressly required by the contract).

12

members bound by the Medical Settlement unless they opted out. The opt out deadline was in November 2012. After that point, BP had a list of 1,638 valid opt outs. The list provides first and last names, addresses, date of birth, attorney if represented, and GCCF claimant number if available. (Rec. Doc. 7989-12). At this point, the only information BP needed to tender a claim to O'Brien is employment information. Such information was almost certainly available for all of these workers. The short form joinders that plaintiffs could file to join the B3 Master Complaint required the plaintiff to list employer information. The Court acknowledges, however, that there is no guarantee that all cleanup workers would have filed a short form joinder or filled out the employer information. BP also had several databases containing worker information from the response. (*See* Medical Settlement § XXI.B). The Court finds that waiting almost five years after the opt out deadline to finally tender these claims to O'Brien violated the express provision that it provide O'Brien with prompt notice. Furthermore, the Court finds that this delay amounts to prejudice as a matter of law, assuming prejudice must be shown.[7]

Accordingly, the Court finds that O'Brien is not required to indemnify BP against the B3 claims.

---

[7] But for the fact that the Court has already determined that NRC does not have to indemnify BP against any claims (*see supra* Part III(A)), the Court would also find that this delay also failed the requirement imposed by law that BP provide NRC with "reasonable" notice and caused prejudice to NRC. *See Gonzalez v. Denning*, 394 F.3d 388, 395 (5th Cir. 2004) ("Texas law implies a duty to perform a contract within a reasonable time.").

### D. BP Is Not an Additional Insured on the Bumbershoot and First Excess Policies

Separate from requiring O'Brien to indemnify BP against certain claims,[8] the O'Brien Contract also required O'Brien to carry certain types of insurance. Furthermore, O'Brien had to name BP as an additional insured on at least some of its policies. Sections 12.01 and 12.02 of O'Brien Contract stated:

> 12.01 <u>Insurance</u>. Contractor [O'Brien] shall at all times during the term of this Contract maintain, at its sole cost, the following insurance coverage:
>
> > 12.01.01 Workers' Compensation Insurance which complies with all applicable laws wherever the Services are performed . . . and wherever Contractor's contracts of employment are entered into;
> >
> > 12.01.02 Employer's Liability Insurance, or its equivalent, with limits of not less than US $1,000,000;
> >
> > 12.01.03 Comprehensive General Liability Insurance, including contractual liability coverage, with minimum limits of US $2,000,000 per occurrence;
> >
> > 12.01.04 Automobile Liability Insurance covering all vehicles used in the Services with a minimum combined single limit of not less than US $1,000,000 per occurrence for bodily injury and property damage.
>
> 12.02 ***Except for Workers' Compensation Insurance set forth in Section 12.01.01, all policies shall name the Company Group [BP] as additional insureds.*** In addition, all of the policies listed above, without exception, shall be endorsed to waive subrogation against the Company Group [BP] by use of the following language: "The insurers hereby waive their rights of

---

[8] The O'Brien Contract states, "[T]he indemnity obligations of [O'Brien] as set out in this Article 11 are independent of any insurance requirements as set out in Article 12, and such indemnity obligations shall not be limited by any insurance requirements and shall not be lessened or extinguished by reason of [O'Brien's] failure to obtain the required insurance coverage or by any defenses asserted by [O'Brien's] insurers." (O'Brien Contract § 11.07; *see also id.* §§ 11.02, 11.003 (stating that the duty to indemnify exists "irrespective of insurance coverages")).

14

>   subrogation against BP American Production Company ("Company") and the other entities and persons of the Company Group under that certain Contract No. BPO-04-01476 between Company and The O'Brien's Group, Inc. ("Contractor"), and against any individuals, firms, or corporations for whom or with whom Company may be acting." Additionally, if Contractor shall perform any Services hereunder on navigable waters then each of the policies listed in 12.01.02 and 12.01.03 above shall be endorsed to cover marine operations.

(Rec. Doc. 59-5 at 9) (emphasis added).

O'Brien maintained four insurance policies that are relevant here:

1. Marine General Liability Policy, with coverage limits of $1 million per occurrence and $2 million in aggregate ("MGL Policy," Rec. Doc. 49-3) [9]
2. Contractor's Operations and Professional Services Environmental Insurance Policy, with coverage limits of $1 million per claim and $2 million in aggregate ("COPS Policy," Rec. Doc. 49-4)
3. Primary Bumbershoot Liability Policy, with $10 million coverage limit ("Bumbershoot Policy," Rec. Doc. 49-1)[10]
4. First Excess Bumbershoot Liability Policy, with $90 million coverage limit ("First Excess Policy," Rec. Doc. 49-2)[11]

The parties appear to agree that BP is an additional insured on the MGL Policy and the COPS Policy.[12] At issue is whether BP is also an additional insured on the Bumbershoot Policy and the First Excess Policy. BP asserts that it is; Navigators claims it is not.

BP is not explicitly listed as an additional insured on the Bumbershoot or the

---

[9] BP and the Responders refer to the MGL Policy as the "Starr Policy."
[10] BP and the Responders refer to the Bumbershoot Policy as the "Navigators Policy."
[11] The Court understands that O'Brien also maintained Second and Third Excess Polices, which provided $250 million in combined coverage excess of the First Excess Policy. These polices have not been provided to the Court, and Navigators—the only insurer BP sued in its third party claim—is not the lead insurer on either. Accordingly, the Court does not consider the Second and Third Excess Policies here. Nevertheless, BP alleges that the First, Second, and Third Excess Policies are all follow-form policies that adopted the terms and conditions of the Bumbershoot Policy. If this is correct, then the Court's ruling on the Bumbershoot and First Excess Policies would likely apply to the Second and Third Excess Policies as well.
[12] The parties' briefing indicates that these two policies have been exhausted, however.

First Excess Policy. However, those policies state that "[t]he unqualified word 'Assured,' . . . includes not only the Named Assured [O'Brien] but also . . . any . . . organization . . . to whom the Named Assured is **obligated** by virtue of a written contract or agreement to provide insurance such as is afforded by this policy, but only in respect of operations by or on behalf of the Named Assured." (Rec. Doc. 49-1 at 11) (emphasis added). Therefore, whether BP is an additional insured on these policies turns on what O'Brien was "obligated" to provide under the O'Brien Contract. *See Ironshore Ins. Co. v. Aspen Underwriting, Ltd.*, 788 F.3d 456 (5th Cir. 2015) (discussed below).

Section 12.01 of the O'Brien Contract (quoted above) required O'Brien to maintain four types insurance: workers compensation, comprehensive general liability ("CGL"), employer's liability, and automobile liability. The first sentence of Section 12.02 then states, "Except for Workers' Compensation Insurance set forth in Section 12.01.01, all policies shall name the Company Group [BP] as additional insureds." The parties debate whether "all policies" in this sentence refers to only the three types of insurance explicitly required in Section 12.01 or all policies that O'Brien carried, whether required by the O'Brien Contract or not. For essentially the reasons put forth by Navigators and O'Brien,[13] the Court concludes that, when properly considered in context and not in a vacuum, "all policies" refers to the three types of insurance (and the corresponding amounts of insurance coverage) explicitly listed in Section 12.01. *See also Musgrove v. Southland Corp.*, 898 F.2d 1041, 1043-

---

[13] *See* Responders' Mtn. at 21-25, Rec. Doc. 58-1; Responders' Opp'n at 18-23, Rec. Doc. 62; Navigators' Mtn. at 14-15, Rec. Doc. 60; Navigators' Opp'n at 11-17, Rec. Doc. 63.

16

44 (5th Cir. 1990) (holding that Citgo was not an additional insured on the Contractor's excess liability policy (which provided coverage excess of a $1 million CGL policy), because the excess policy only extended coverage to entities "to whom . . . the Named Insured is obligated by virtue of a written contract to provide insurance" and the underlying contract—despite requiring that "[a]ll insurance coverages carried by Contractor, ***whether or not required hereby***, . . . shall extend to and protect [Citgo]"—only "obligated" the Contractor to maintain a minimum of $1 million in CGL insurance).[14]

Of the three types of insurance listed in Section 12.01, the only type of insurance that could potentially cover the B3 and BELO claims is "[CGL] Insurance, including contractual liability coverage, with minimum limits of US $2,000,000 per occurrence." Navigators contends, and BP does not appear to dispute (*see* Rec. Doc. 61 at 17), that the MGL Policy and the COPS Policy each provided CGL insurance and together provided limits of $2 million per occurrence. As mentioned above, there also appears to be no dispute that BP is an additional insured on these policies. Therefore, together the MGL Policy and COPS Policy satisfied O'Brien's obligation to make BP an additional insured on CGL insurance with minimum limits of $2 million per occurrence.

While the Bumbershoot and First Excess Policies may provide additional CGL coverage excess of the MGL and COPS Policies, the O'Brien Contract did not obligate O'Brien to maintain this additional coverage or provide it to BP. Under controlling

---

[14] Although *Musgrove* applied Louisiana law, the Fifth Circuit later cited it with approval in a decision applying Texas law. *See Forrest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1045 (5th Cir. 1991).

precedent, then, BP is not an additional insured on the Bumbershoot and First Excess Policies. In *Ironshore Specialty Insurance Co. v. Aspen Underwriting, Ltd.*, a master services agreement ("MSA") required the contractor, Basic, to indemnify the well owner, Endeavor, against claims by Basic's employees, regardless of fault. 788 F.3d 456, 457-58 (5th Cir. 2015). The MSA also required Basic "[t]o support the indemnification provision in this [MSA]" with $5 million in CGL insurance ($1 million in primary CGL plus $4 million in excess coverage). *Id.* Basic, however, purchased $51 million in CGL insurance ($1 million in primary CGL and $50 million in excess). *Id.* When Endeavor was later sued by the families of two Basic employees who were killed in a fire at Endeavor's well, a dispute arose over whether Endeavor was an additional insured with respect to the entire $51 million or only the $5 million required by the MSA. *Id.* at 458-59. Like the Bumbershoot and First Excess Policies here, Basic's excess insurance policies stated that coverage extended to "any person or entity to whom [Basic] is ***obliged*** by a written 'Insured Contract' . . . to provide insurance such as is afforded by this Policy . . ." *Id.* at 460 (emphasis added). Applying Texas law, the Fifth Circuit held that Endeavor was limited to $5 million in insurance, because that is the amount Basic was "obligated" to provide under the MSA. *Id.* at 463.

Just as Endeavor was an additional insured only with respect to the $5 million in CGL insurance that Basic was obligated to provide by the MSA, so is BP only an additional insured with respect to the $2 million in CGL insurance that O'Brien was obligated to provide by the O'Brien Contract. Thus, BP is not an additional insured

18

with respect to the Bumbershoot and First Excess Policies.

Additionally, and in the alternative, Navigators argues that BP is not an additional insured on the Bumbershoot and First Excess Policies because of the so-called Drilling Rig exclusion.[15] Given the Court's conclusion above, it is not necessary to decide whether this exclusion applies.

### E. O'Brien Did Not Breach Its Contractual Obligation to Make BP an Additional Insured; Alternatively, BP's Breach of Contract Claim Is Untimely

BP asserts that if the Court finds that it is not an additional insured, then O'Brien has breached its contractual obligation to acquire coverage for BP. As just discussed, however, the GML and COPS Policies satisfied O'Brien's obligation under the O'Brien Contact. Therefore, BP's breach of contract claim is without merit and can be dismissed.

Alternatively, even if the Court determined that O'Brien breached its obligation to provide BP with insurance, the Court would still dismiss BP's breach of contract claim because it is untimely. Texas has a four year statute of limitations on contract claims. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). If O'Brien breached its contract with BP, BP's claim would have accrued in 2010 at the latest. Therefore, BP needed to file suit by 2014, not 2019.

### IV. CONCLUSION

For the reasons explained above, the Responders do not owe BP contractual

---

[15] "This insurance shall be free from liability or expense arising . . . from ownership, use or operation of drilling rigs, drilling barges, drilling tenders and platforms, but this exclusion shall not apply to craft serving the foregoing such as crew, supply, or utility boats, tenders or tugs." (Rec. Doc. 49-1 at 24).

19

indemnification against the BELO cases or the B3 cases. Furthermore, BP is not an additional insured on the Bumbershoot Policy or the First Excess Policy. Finally, BP's breach of contract claim against O'Brien regarding insurance must be dismissed because O'Brien satisfied its obligation to provide BP with certain insurance, or, alternatively, BP's claim is untimely.

Accordingly,

IT IS ORDERED that the Responders' and Navigators' Motions for Judgment on the Pleadings (Rec. Docs. 58, 60) is GRANTED.

IT FURTHER ORDERED that BP's Motion for Judgment on the Pleadings (Rec. Doc. 59) is DENIED.

IT IS FURTHER ORDERED that within seven days the Responders and Navigators shall jointly submit a proposed judgment in accordance with the Court's rulings.

New Orleans, Louisiana, this 4th day of May, 2020.

  _____
  United States District Judge